**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 13-2419

PPL ENERGYPLUS, LLC; PPL BRUNNER ISLAND, LLC; PPL HOLTWOOD, LLC; PPL MARTINS CREEK, LLC; PPL MONTOUR, LLC; PPL SUSQUEHANNA, LLC; LOWER MOUNT BETHEL ENERGY, LLC; PPL NEW JERSEY SOLAR, LLC; PPL NEW JERSEY BIOGAS, LLC; PPL RENEWABLE ENERGY, LLC; PSEG POWER LLC; ESSENTIAL POWER, LLC,

        Plaintiffs - Appellees,

     v.

DOUGLAS R.M. NAZARIAN; HAROLD WILLIAMS; LAWRENCE BRENNER; KELLY SPEAKES-BACKMAN; KEVIN HUGHES,

        Defendants – Appellants,

     and

CPV MARYLAND, LLC,

        Defendant.

-------------------------

AMERICAN PUBLIC POWER ASSOCIATION; NATIONAL RURAL ELECTRIC COOPERATIVE ASSOCIATION; NRG ENERGY INC.; MARYLAND OFFICE OF PEOPLE'S COUNSEL; CONNECTICUT PUBLIC UTILITIES REGULATORY AUTHORITY; CONNECTICUT DEPARTMENT OF ENERGY AND ENVIRONMENTAL PROTECTION; GEORGE JEPSEN, Attorney General for the State of Connecticut; CONNECTICUT OFFICE OF CONSUMER COUNSEL; NEW ENGLAND CONFERENCE OF PUBLIC UTILITIES COMMISSIONERS, INC.; MAINE PUBLIC UTILITIES COMMISSION; RHODE ISLAND PUBLIC UTILITIES COMMISSION; VERMONT PUBLIC SERVICE BOARD; VERMONT DEPARTMENT OF PUBLIC SERVICE; CALIFORNIA PUBLIC UTILITIES COMMISSION; PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK (NYPSC); PUBLIC SERVICE COMMISSION OF THE DISTRICT OF COLUMBIA; DELAWARE PUBLIC SERVICE COMMISSION; NEW JERSEY BOARD OF PUBLIC UTILITIES;

NEW JERSEY DIVISION OF RATE COUNSEL; MARYLAND ENERGY ADMINISTRATION; AMERICAN WIND ENERGY ASSOCIATION; THE MID-ATLANTIC RENEWABLE ENERGY COALITION,

Amici Supporting Appellants,

PJM POWER PROVIDERS GROUP; ELECTRIC POWER SUPPLY ASSOCIATION; EDISON ELECTRIC INSTITUTE,

Amici Supporting Appellees.

---

**No. 13-2424**

---

PPL ENERGYPLUS, LLC; PPL BRUNNER ISLAND, LLC; PPL HOLTWOOD, LLC; PPL MARTINS CREEK, LLC; PPL MONTOUR, LLC; PPL SUSQUEHANNA, LLC; LOWER MOUNT BETHEL ENERGY, LLC; PPL NEW JERSEY SOLAR, LLC; PPL NEW JERSEY BIOGAS, LLC; PPL RENEWABLE ENERGY, LLC; PSEG POWER LLC; ESSENTIAL POWER, LLC,

Plaintiffs - Appellees,

v.

CPV MARYLAND, LLC,

Defendant – Appellant,

and

DOUGLAS R.M. NAZARIAN; HAROLD WILLIAMS; LAWRENCE BRENNER; KELLY SPEAKES-BACKMAN; KEVIN HUGHES,

Defendants.

--------------------------

AMERICAN PUBLIC POWER ASSOCIATION; NATIONAL RURAL ELECTRIC COOPERATIVE ASSOCIATION; NRG ENERGY INC.; MARYLAND OFFICE OF PEOPLE'S COUNSEL; CONNECTICUT PUBLIC UTILITIES REGULATORY AUTHORITY; CONNECTICUT DEPARTMENT OF ENERGY AND ENVIRONMENTAL PROTECTION; GEORGE JEPSEN, Attorney General for the State of Connecticut; CONNECTICUT OFFICE OF CONSUMER COUNSEL; NEW ENGLAND CONFERENCE OF PUBLIC UTILITIES

2

COMMISSIONERS, INC.; MAINE PUBLIC UTILITIES COMMISSION; RHODE ISLAND PUBLIC UTILITIES COMMISSION; VERMONT PUBLIC SERVICE BOARD; VERMONT DEPARTMENT OF PUBLIC SERVICE; CALIFORNIA PUBLIC UTILITIES COMMISSION; PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK (NYPSC); PUBLIC SERVICE COMMISSION OF THE DISTRICT OF COLUMBIA; DELAWARE PUBLIC SERVICE COMMISSION; NEW JERSEY BOARD OF PUBLIC UTILITIES; NEW JERSEY DIVISION OF RATE COUNSEL; MARYLAND ENERGY ADMINISTRATION; AMERICAN WIND ENERGY ASSOCIATION; THE MID-ATLANTIC RENEWABLE ENERGY COALITION,

Amici Supporting Appellant,

PJM POWER PROVIDERS GROUP; ELECTRIC POWER SUPPLY ASSOCIATION; EDISON ELECTRIC INSTITUTE,

Amici Supporting Appellees.

———————————

Appeals from the United States District Court for the District of Maryland, at Baltimore. Marvin J. Garbis, Senior District Judge. (1:12-cv-01286-MJG)

———————————

Argued: May 13, 2014                    Decided: June 2, 2014

———————————

Before WILKINSON, KEENAN, and DIAZ, Circuit Judges.

———————————

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Keenan and Judge Diaz joined.

———————————

**ARGUED**: Scott H. Strauss, SPIEGEL & MCDIARMID, LLP, Washington, D.C.; Clifton Scott Elgarten, CROWELL & MORING LLP, Washington, D.C., for Appellants. Paul D. Clement, BANCROFT, PLLC, Washington, D.C., for Appellees. **ON BRIEF**: H. Robert Erwin, Ransom E. Davis, Baltimore, Maryland; Peter J. Hopkins, Jeffrey A. Schwarz, SPIEGEL & MCDIARMID LLP, Washington, D.C., for Appellants Douglas R.M. Nazarian, Harold Williams, Lawrence Brenner, Kelly Speakes-Backman, and Kevin Hughes. Larry F. Eisenstat, Richard Lehfeldt, Jennifer N. Waters, CROWELL & MORING LLP, Washington, D.C., for Appellant CPV Maryland, LLC. Erin E. Murphy, Candice Chiu, BANCROFT PLLC, Washington, D.C., for Amici. Jesse A. Dillon, PPL SERVICES CORP., Allentown,

3

Pennsylvania; David L. Meyer, MORRISON & FOERSTER LLP, Washington, D.C., for Appellees PPL EnergyPlus, LLC, PPL Brunner Island, LLC, PPL Holtwood, LLC, PPL Martins Creek, LLC, PPL Montour, LLC, PPL Susquehanna, LLC, Lower Mount Bethel Energy, LLC, PPL New Jersey Solar, LLC, PPL New Jersey Biogas, LLC, and PPL Renewable Energy, LLC. Tamara Linde, Vice President-Regulatory, Vaughn L. McKoy, General State Regulatory Counsel, PSEG SERVICES CORP., Newark, New Jersey; Shannen W. Coffin, STEPTOE & JOHNSON LLP, Washington, D.C., for Appellee PSEG Power, LLC. David Musselman, ESSENTIAL POWER, LLC, Princeton, New Jersey, for Appellee Essential Power, LLC. Susan N. Kelly, Senior Vice President of Policy Analysis and General Counsel, Delia D. Patterson, Assistant General Counsel, AMERICAN PUBLIC POWER ASSOCIATION, Washington, D.C.; Jay A. Morrison, Vice President, Regulatory Issues, Pamela M. Silberstein, Associate Director, Power Supply Issues, NATIONAL RURAL ELECTRIC COOPERATIVE ASSOCIATION, Arlington, Virginia, for Amici American Public Power Association and National Rural Electric Cooperative Association. Abraham Silverman, Cortney Madea, NRG ENERGY, INC., Princeton, New Jersey; Jeffrey A. Lamken, Martin V. Totaro, Washington, D.C., Kaitlin R. O'Donnell, MOLOLAMKEN LLP, New York, New York, for Amicus NRG Energy Inc. Paula M. Carmody, William F. Fields, MARYLAND OFFICE OF PEOPLE'S COUNSEL, Baltimore, Maryland, for Amicus Maryland Office of People's Counsel. Randall L. Speck, Jeffrey A. Fuisz, Kimberly B. Frank, Susanna Y. Chu, KAYE SCHOLER LLP, Washington, D.C., for Amici. Clare E. Kindall, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, New Britain, Connecticut, for Amicus Connecticut Public Utilities Regulatory Authority. Robert D. Snook, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, New Britain, Connecticut, for Amicus Connecticut Department of Energy and Environmental Protection. John S. Wright, Assistant Attorney General, Michael C. Wertheimer, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, New Britain, Connecticut, for Amicus George Jepsen, Attorney General for the State of Connecticut. Elin Swanson Katz, Joseph A. Rosenthal, CONNECTICUT OFFICE OF CONSUMER COUNSEL, New Britain, Connecticut, for Amicus Connecticut Office of Consumer Counsel. Sarah Hofmann, Executive Director, NEW ENGLAND CONFERENCE OF PUBLIC UTILITIES COMMISSIONERS, INC., Montpelier, Vermont, for Amicus New England Conference of Public Utilities Commissioners, Inc. Lisa Fink, STATE OF MAINE PUBLIC UTILITIES COMMISSION, Augusta, Maine, for Amicus Maine Public Utilities Commission. Amy K. D'Alessandro, RHODE ISLAND PUBLIC UTILITIES COMMISSION, Warwick, Rhode Island, for Amicus Rhode Island Public Utilities Commission. June Tierney, General Counsel, VERMONT PUBLIC SERVICE BOARD, Montpelier, Vermont, for Amicus Vermont Public

4

Service Board. Edward McNamara, Regional Policy Director, VERMONT DEPARTMENT OF PUBLIC SERVICE, Montpelier, Vermont, for Amicus Vermont Department of Public Service. Frank Lindh, Candace Morey, CALIFORNIA PUBLIC UTILITIES COMMISSION, San Francisco, California, for Amicus California Public Utilities Commission. Kimberly A. Harriman, Acting General Counsel, Jonathan D. Feinberg, Solicitor, Alan Michaels, Assistant Counsel, PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK, Albany, New York, for Amicus Public Service Commission of the State of New York. Richard A. Beverly, Richard S. Herskovitz, PUBLIC SERVICE COMMISSION OF THE DISTRICT OF COLUMBIA, Washington, D.C., for Amicus Public Service Commission of the District of Columbia. Kathleen Makowski, Deputy Attorney General, DELAWARE PUBLIC SERVICE COMMISSION, Dover, Delaware, for Amicus Delaware Public Service Commission. John Jay Hoffman, Acting Attorney General, Richard F. Engel, Deputy Attorney General, Lisa J. Morelli, Deputy Attorney General, Alex Moreau, Deputy Attorney General, Jennifer S. Hsia, Deputy Attorney General, NEW JERSEY DEPARTMENT OF LAW AND PUBLIC SAFETY, Trenton, New Jersey, for Amicus New Jersey Board of Public Utilities. Stefanie A. Brand, Director, NEW JERSEY DIVISION OF RATE COUNSEL, Trenton, New Jersey, for Amicus New Jersey Division of Rate Counsel. Douglas F. Gansler, Attorney General, Brent A. Bolea, Assistant Attorney General, Steven M. Talson, Assistant Attorney General, MARYLAND ENERGY ADMINISTRATION, Annapolis, Maryland, for Amicus Maryland Energy Administration. Gene Grace, AMERICAN WIND ENERGY ASSOCIATION, Washington, D.C., for Amici American Wind Energy Association and The Mid-Atlantic Renewable Energy Coalition. Glen Thomas, PJM POWER PROVIDERS GROUP, King of Prussia, Pennsylvania; John Lee Shepherd, Jr., Karis Anne Gong, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Washington, D.C., for Amicus PJM Power Providers Group. David G. Tewksbury, Stephanie S. Lim, Ashley C. Parrish, KING & SPALDING LLP, Washington, D.C., for Amicus The Electric Power Supply Association. Edward H. Comer, Vice President, General Counsel and Corporate Secretary, Henri D. Bartholomot, Associate General Counsel, Regulatory and Litigation, EDISON ELECTRIC INSTITUTE, Washington, D.C., for Amicus Edison Electric Institute.

———————————

WILKINSON, Circuit Judge:

At issue is a Maryland program to subsidize the participation of a new power plant in the federal wholesale energy market. Appellees are energy firms that compete with this new plant in interstate commerce. They contend that the Maryland scheme is preempted under the Federal Power Act's authorizing provisions, which grant exclusive authority over interstate rates to the Federal Energy Regulatory Commission. The district court agreed. For the reasons that follow, we affirm.

I.

A.

For much of the 20th century, the energy market was dominated by vertically integrated firms that produced, transmitted, and delivered power to end-use customers. New York v. FERC, 535 U.S. 1, 5 (2002); PPL EnergyPlus, LLC v. Nazarian, 974 F. Supp. 2d 790, 798 (D. Md. 2013) (opinion below). These firms were subject to extensive local regulation, though state power in this respect was limited by the strictures of the dormant Commerce Clause. See Pub. Utils. Comm'n v. Attleboro Steam & Elec. Co., 273 U.S. 83, 89 (1927).

The Federal Power Act (FPA), passed in 1935, was designed in part to fill the regulatory gap created by the dormant Commerce Clause and cover the then-nascent field of interstate electricity sales. It vests the Federal Energy Regulatory

6

Commission (FERC) with authority over the "transmission of electric energy in interstate commerce" and the "sale of electric energy at wholesale in interstate commerce." 16 U.S.C. § 824(b)(1). Federal regulation has become increasingly prominent as the energy market has shifted away from local monopolies to a system of interstate competition. See New York, 535 U.S. at 7.

Rather than ensuring the reasonableness of interstate transactions by directly setting rates, FERC has chosen instead to achieve its regulatory aims indirectly by protecting "the integrity of the interstate energy markets." N.J. Bd. of Pub. Utils. v. FERC, 744 F.3d 74, 81 (3d Cir. 2014). To this end, FERC has authorized the creation of "regional transmission organizations" to oversee certain multistate markets. PJM Interconnection, LLC (PJM), superintended by FERC, administers a large regional market that (as relevant here) includes Maryland and the District of Columbia.

PJM operates both energy and capacity markets. The energy market is essentially a real-time market that enables PJM to buy and sell electricity to distributors for delivery within the next hour or 24 hours.

The capacity market is a forward-looking market, which gives buyers the option to purchase electricity in the future. In the capacity market, PJM sets a quota based on how much

7

capacity it predicts will be needed three years hence and then relies on a Reliability Pricing Model (RPM) to determine the appropriate price per unit. Auction participants bid to sell capacity for a single year, three years in the future. PJM stacks the bids from lowest to highest and, starting at the bottom, accepts bids until it has acquired sufficient capacity to satisfy its quota.

The highest-priced bid that PJM must accept to meet this quota establishes the market-clearing price. Every generator who bids at or below this level "clears" the market and is paid the clearing price, regardless of the price at which it actually bid. Existing generators are permitted to bid at zero as "price-takers," meaning they agree to sell at whatever the clearing price turns out to be.

Both the capacity and energy markets are designed to efficiently allocate supply and demand, a function which has the collateral benefit of incentivizing the construction of new power plants when necessary. Clearing prices occasionally differ based on geographical subdivisions designed by FERC to stimulate new construction by signaling that certain regions are prone to supply shortages. Such price signals are not the sole mechanism for incentivizing generation, however. PJM's new entry price adjustment (NEPA) guarantees certain new producers a fixed price for three years to "support . . . the new entrant until

sufficient load growth [i.e., increased demand] would be expected to" do so. PJM Interconnection, LLC, 128 FERC ¶ 61,157, at ¶ 101 (2009).

In 2006, FERC instituted a requirement (the minimum offer price rule, or MOPR) that new generators in certain circumstances bid at or above a specified price, fixed according to the agency's estimation of a generic energy project's cost. This rule was designed to prevent the manipulation of clearing prices through the exercise of buyer market power. The MOPR originally exempted certain state-supported generators, however, and permitted them to bid at zero.

Following a complaint lodged by several competitors, FERC eliminated the exemption for state-sanctioned plants. The new rule required such plants to bid initially at the agency-specified minimum price unless they could demonstrate that their actual costs were lower than this default price. FERC held that this adjustment was necessary to protect the integrity of its markets against below-cost bids by subsidized plants that might artificially suppress clearing prices. See PJM Interconnection, LLC, 137 FERC ¶ 61,145, at ¶ 96 (2011).

As these features suggest, the federal markets are the product of a finely-wrought scheme that attempts to achieve a variety of different aims. FERC rules encourage the construction of new plants and sustain existing ones. They seek to preclude

state distortion of wholesale prices while preserving general state authority over generation sources. They satisfy short-term demand and ensure sufficient long-term supply. In short, the federal scheme is carefully calibrated to protect a host of competing interests. It represents a comprehensive program of regulation that is quite sensitive to external tampering.

B.

In 1999, Maryland decided to abandon the vertical integration model and throw in its lot with the federal interstate markets. Deregulation was accomplished by the Electric Customer Choice and Competition Act, Md. Code Ann., Pub. Utils. § 7-501, et seq., which divested utilities of their generation resources, effectively compelling Maryland energy firms to participate in the federal wholesale markets. See PPL EnergyPlus, LLC, 974 F. Supp. 2d at 815. The state believed that these markets would ultimately produce more efficient and cost-effective service than traditional monopolies, thus providing state residents the benefit of lower prices. See In the Matter of Baltimore Gas and Electric Company's Proposal, Order No. 81423, at 36 (Md. Pub. Serv. Comm'n, May 2007). Maryland's decision to participate in the federal scheme and enjoy its benefits was necessarily accompanied by a relinquishment of the regulatory autonomy the state had formerly enjoyed with respect to traditional utility monopolies.

10

Maryland soon became concerned, though, that the RPM was failing to adequately incentivize new generation. PPL EnergyPlus, LLC, 974 F. Supp. 2d at 795. To solve this perceived problem, the Maryland Public Service Commission (MPSC) solicited proposals for the construction of a new power plant. The plant was to be located in the "SWMAAC zone," an area comprising part of Maryland and all of D.C., which the state believed was at heightened risk for reliability problems. In order to attract offers, the MPSC offered the successful bidder a fixed, twenty-year revenue stream secured by contracts for differences (CfDs) that the state would compel one or more of its local electric distribution companies (EDCs) to enter. Maryland's plan was ultimately formalized in the Generation Order, issued by MPSC in 2012.

Intervenor-appellant Commercial Power Ventures Maryland, LLC (CPV) submitted the winning bid and was awarded the promised CfDs. The CfDs required CPV to build a plant and sell its energy and capacity on the federal interstate wholesale markets. If CPV successfully cleared the market, it would be eligible for payments from the EDCs amounting to the difference between CPV's revenue requirements per unit of energy and capacity sold (set forth in its winning bid) and its actual sales receipts. These costs would in turn be passed on to the EDCs' retail ratepayers. If CPV's receipts exceeded its approved revenue requirements, it

would be obligated to pay the difference to the EDCs. The CfDs did not require CPV to actually sell any energy or capacity to the EDCs.

Plaintiffs-appellees are existing power plants in competition with CPV who allege that the Generation Order is unconstitutional and has resulted in the suppression of PJM prices, a reduction in their revenue from the PJM market, and a distortion of the price signals that market participants rely on in determining whether to construct new capacity. After a six-day bench trial, the district court found the Generation Order field preempted. It reasoned that the CfD payments had the effect of setting the ultimate price that CPV receives for its sales in the PJM auction, thus intruding on FERC's exclusive authority to set interstate wholesale rates. It did not reach appellees' conflict preemption claim and rejected their dormant Commerce Clause claim. This appeal followed.

## II.

Plaintiffs argue that the Generation Order and the resulting CfDs are preempted by federal law under the Supremacy Clause. U.S. Const. art. VI, cl. 2. They ground this contention

12

in two alternative theories: field preemption and conflict preemption. We address each in turn.[1]

A.

Preemption of all varieties is ultimately a question of congressional intent. Nw. Cent. Pipeline Corp. v. State Corp. Comm'n, 489 U.S. 493, 509 (1989). Here, the district court found the Generation Order invalid under the doctrine of field preemption, which applies when "Congress has legislated comprehensively to occupy an entire field of regulation, leaving no room for the States to supplement federal law." Id. Actual conflict between a challenged state enactment and relevant federal law is unnecessary to a finding of field preemption; instead, it is the mere fact of intrusion that offends the Supremacy Clause. See N. Natural Gas Co. v. State Corp. Comm'n, 372 U.S. 84, 97-98 (1963). "If Congress evidences an intent to occupy a given field, any state law falling within that field is pre-empted." Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 248 (1984).

---

[1] As a threshold matter, appellants assert that we lack jurisdiction under the filed rate doctrine. See Appellants' Br. at 9. This claim is meritless, however, given that a judgment in plaintiffs' favor would require this court neither "to invalidate a filed rate nor to assume a rate would be charged other than the rate adopted by the federal agency in question." Pub. Util. Dist. No. 1 v. IDACORP Inc., 379 F.3d 641, 650 (9th Cir. 2004) (internal quotation marks omitted).

13

Statutory text and structure provide the most reliable guideposts in this inquiry. See <u>Medtronic, Inc. v. Lohr</u>, 518 U.S. 470, 486 (1996) ("Congress' intent, of course, primarily is discerned from the language of the pre-emption statute and the statutory framework surrounding it.") (internal quotation marks omitted). The FPA's "declaration of policy" states:

> It is declared that the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest, and that Federal regulation of matters relating to generation to the extent provided in this subchapter and subchapter III of this chapter and of that part of such business which consists of the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce is necessary in the public interest, such Federal regulation, however, to extend only to those matters which are not subject to regulation by the States.

16 U.S.C. § 824(a); <u>see also</u> <u>id.</u> at § 824(b).

The breadth of this grant of authority is confirmed by the FPA's similarly capacious substantive and remedial provisions. For example, 16 U.S.C. § 824d(a) states that:

> All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.

A wealth of case law confirms FERC's exclusive power to regulate wholesale sales of energy in interstate commerce, including the justness and reasonableness of the rates charged.

14

"The [FPA] long has been recognized as a comprehensive scheme of federal regulation of all wholesales of [energy] in interstate commerce," Schneidewind v. ANR Pipeline Co., 485 U.S. 293, 300 (1988) (internal quotation marks omitted), and "FERC's jurisdiction over interstate wholesale rates is exclusive," Appalachian Power Co. v. Pub. Serv. Comm'n, 812 F.2d 898, 902 (4th Cir. 1987); see also New England Power Co. v. New Hampshire, 455 U.S. 331, 340 (1982).[2] In this area, "if FERC has jurisdiction over a subject, the States cannot have jurisdiction over the same subject." Miss. Power & Light Co. v. Mississippi ex rel. Moore, 487 U.S. 354, 377 (1988) (Scalia, J., concurring in the judgment).

Indeed, the Supreme Court has expressly rejected the proposition that the "scope of [FERC's] jurisdiction . . . is to be determined by a case-by-case analysis of the impact of state regulation upon the national interest." Nantahala Power & Light Co. v. Thornburg, 476 U.S. 953, 966 (1986) (quoting FPC v. S. Cal. Edison Co., 376 U.S. 205, 215 (1964)) (internal quotation marks omitted). Instead, "Congress meant to draw a bright line

---

[2] Schneidewind dealt with the Natural Gas Act rather than the FPA. However, because "the relevant provisions of the two statutes are in all material respects substantially identical," the Supreme Court has adopted an "established practice of citing interchangeably decisions interpreting the pertinent sections of the two statutes." Ark. La. Gas Co. v. Hall, 453 U.S. 571, 578 n.7 (1981) (internal quotation marks omitted).

easily ascertained, between state and federal jurisdiction . . . . This was done in the [FPA] by making [FERC] jurisdiction plenary and extending it to all wholesale sales in interstate commerce except those which Congress has made explicitly subject to regulation by the States." Id. (quoting S. Cal. Edison Co., 376 U.S. at 215-16) (internal quotation marks omitted).

The federal scheme thus "leaves no room either for direct state regulation of the prices of interstate wholesales of [energy], or for state regulations which would indirectly achieve the same result." N. Natural Gas Co., 372 U.S. at 91 (citation omitted). "Even where state regulation operates within its own field, it may not intrude indirectly on areas of exclusive federal authority." Pub. Utils. Comm'n v. FERC, 900 F.2d 269, 274 n.2 (D.C. Cir. 1990) (internal quotation marks omitted). As a result, states are barred from relying on mere formal distinctions in "an attempt" to evade preemption and "regulate matters within FERC's exclusive jurisdiction." Schneidewind, 485 U.S. at 308.

B.

Applying these principles, we conclude that the Generation Order is field preempted because it functionally sets the rate that CPV receives for its sales in the PJM auction.

16

The CfD payments, which are conditioned on CPV clearing the federal market, plainly qualify as compensation for interstate sales at wholesale, not simply for CPV's construction of a plant. Furthermore, the Order ensures -- through a system of rebates and subsidies calculated on the basis of the PJM market rate -- that CPV receives a fixed sum for every unit of capacity and energy that it clears (up to a certain ceiling). The scheme thus effectively supplants the rate generated by the auction with an alternative rate preferred by the state. See Appalachian Power Co., 812 F.2d at 904 (holding that the agreement at issue did not "set a rate per se," but that it nevertheless "sufficiently resemble[d] a filed rate to come within the realm of exclusive federal jurisdiction"). The Order thus compromises the integrity of the federal scheme and intrudes on FERC's jurisdiction.

Maryland and CPV argue that the Generation Order does not actually set a rate because it does not directly affect the terms of any transaction in the federal market. Relevantly, appellants contend, the Order does not fix the rate that PJM pays to CPV for its sales in the auction; instead, it merely fixes the rate that CPV receives for such sales. On the basis of this asymmetry, appellants contend that the CfD payments represent a separate supply-side subsidy implemented entirely outside the federal market.

We cannot accept this argument. The case of Mississippi Power & Light Co. v. Mississippi ex rel. Moore, 487 U.S. 354 (1988), is illustrative. There, FERC ordered a utility to purchase a specified percentage of a particular generator's output. Id. at 363. The utility petitioned Mississippi to approve an increase in its retail rates to cover the costs imposed by the order, but the state insisted that it retained the authority to determine whether the purchases were prudent before acceding to the request. Id. at 365-67. The Supreme Court rejected this argument, ruling that the state was required to treat the utility's FERC-mandated payments as "reasonably incurred operating expenses for the purpose of setting" the utility's retail rates. Id. at 370; see also Nantahala Power & Light Co., 476 U.S. 953 (rejecting a similar state effort to bar a utility from passing FERC-mandated wholesale rates through to consumers). Mississippi's prudence review was preempted because it denied full effect to the rates set by FERC, even though it did not seek to tamper with the actual terms of an interstate transaction.

As the district court recognized, see PPL EnergyPlus, LLC, 974 F. Supp. 2d at 831, the principles articulated in Mississippi Power & Light Co. apply with equal force to this dispute. If states are required to give full effect to FERC-mandated wholesale rates on the demand side of the equation, it

18

stands to reason that they are also required to do so on the supply side. Here, the contract price guaranteed by the Generation Order supersedes the PJM rates that CPV would otherwise earn -- rates established through a FERC-approved market mechanism. The Order ensures that CPV receives a fixed price for every unit of energy and capacity it sells in the PJM auction, regardless of the market price. The fact that it does not formally upset the terms of a federal transaction is no defense, since the functional results are precisely the same. As in the above-mentioned cases, Maryland has "eroded the effect of the FERC determination and undermined FERC's exclusive jurisdiction." Appalachian Power Co., 812 F.2d at 904.

Our conclusion that the Generation Order "seeks to regulate a field that the [FPA] has occupied also is supported by the imminent possibility of collision between" the state and federal regimes. Schneidewind, 485 U.S. at 310. While the potential for collision between the two schemes is discussed in detail in Part D, a high probability of conflict tends to suggest that Congress intended federal authority in a particular field to be uniform and exclusive. See id. Even if "collision between the state and federal regulation" in this case is not "an inevitable consequence," it is sufficiently likely to warrant invalidating the Maryland program "in order to assure the effectuation of the

comprehensive federal regulation ordained by Congress." N.
Natural Gas Co., 372 U.S. at 92.

C.

Appellants argue that this court should apply a robust
version of the presumption against preemption to save the
Maryland scheme. See, e.g., Intervenor-Appellant's Br. at 14. As
its name suggests, this presumption militates against findings
of federal preemption, especially in areas of traditional state
authority. See Rice v. Santa Fe Elevator Corp., 331 U.S. 218,
230 (1947). However, the presumption "is not triggered when the
State regulates in an area where there has been a history of
significant federal presence." United States v. Locke, 529 U.S.
89, 108 (2000). The presumption "is almost certainly not
applicable here because the federal government has long
regulated wholesale electricity rates." IDACORP Inc., 379 F.3d
at 648 n.7. Nevertheless, even were we to apply the presumption,
we would find it overcome by the text and structure of the FPA,
which unambiguously apportions control over wholesale rates to
FERC.

Appellants emphasize the FPA's decree that FERC "shall not
have jurisdiction, except as specifically provided in this
subchapter and subchapter III of this chapter, over facilities
used for the generation of electric energy." 16 U.S.C.
§ 824(b)(1). They contend that the Generation Order falls on the

state side of the jurisdictional line, since it is designed to ensure that Maryland enjoys an adequate supply of generation capacity.

Although states plainly retain substantial latitude in directly regulating generation facilities, they may not exercise this authority in a way that impinges on FERC's exclusive power to specify wholesale rates. As the Supreme Court noted in a similar context:

> [T]he problem of this case is not as to the existence or even the scope of a State's power to [regulate generation facilities]; the problem is only whether the Constitution sanctions the particular means chosen by [the state] to exercise the conceded power if those means threaten effectuation of the federal regulatory scheme.

N. Natural Gas Co., 372 U.S. at 93. Here, Maryland has chosen to incentivize generation by setting interstate wholesale rates. This particular choice of means is impermissible. Wholesale energy prices "fixed by FERC must be given binding effect by state authorities" even "in areas subject to state jurisdiction." California ex rel. Lockyer v. Dynegy, Inc., 375 F.3d 831, 851 (9th Cir. 2004) (internal quotation marks omitted).

Nonetheless, it is important to note the limited scope of our holding, which is addressed to the specific program at issue. We need not express an opinion on other state efforts to encourage new generation, such as direct subsidies or tax

21

rebates, that may or may not differ in important ways from the Maryland initiative. It goes without saying that not "every state statute that has some indirect effect" on wholesale rates is preempted, Schneidewind, 485 U.S. at 308, for "there can be little if any regulation of production that might not have at least an incremental effect on the costs of purchasers in some market," Nw. Cent. Pipeline Corp., 489 U.S. at 514. In this case, however, the effect of the Generation Order on matters within FERC's exclusive jurisdiction is neither indirect nor incidental. Rather, the Order strikes at the heart of the agency's statutory power to establish rates for the sale of electric energy in interstate commerce, see 16 U.S.C. § 824e(a), by adopting terms and prices set by Maryland, not those sanctioned by FERC.

D.

Appellants' position is further complicated by the fact that the principles of field and conflict preemption in this case are mutually reinforcing. As relevant here, conflict preemption applies "where under the circumstances of a particular case, the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 373 (2000) (internal quotation marks and alterations omitted). "What is a sufficient obstacle is a matter

22

of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." Id. "A state law may pose an obstacle to federal purposes by interfering with the accomplishment of Congress's actual objectives, or by interfering with the methods that Congress selected for meeting those legislative goals." College Loan Corp. v. SLM Corp., 396 F.3d 588, 596 (4th Cir. 2005) (emphasis omitted).

In a system of "interlocking" jurisdiction, such as that created by the FPA, "[i]t is inevitable that jurisdictional tensions will arise" -- even if each sovereign formally remains within the confines of its "assigned sphere." Nw. Cent. Pipeline Corp., 489 U.S. at 506, 515 & n.12 (internal quotation marks and alteration omitted). "Thus, conflict-pre-emption analysis must be applied sensitively in this area, so as to prevent the diminution of the role Congress reserved to the States while at the same time preserving the federal role." Id. at 515. Here, "the impact of state regulation of production on matters within federal control is so extensive and disruptive of" the PJM markets that preemption is appropriate. Id. at 517-18.

As an initial matter, the Generation Order has the potential to seriously distort the PJM auction's price signals, thus "interfer[ing] with the method by which the federal statute was designed to reach its goals." IDACORP Inc., 379 F.3d at 650.

23

PJM's price signals are intended to promote a variety of objectives, including incentivizing new generation sources. See PJM Interconnection, LLC, 132 FERC ¶ 61,173, at 61,870 (2010); see also PPL EnergyPlus, LLC, 974 F. Supp. 2d at 813. Market participants necessarily rely on these signals in determining whether to construct new capacity or expand existing resources. The signals appear to be serving their purpose; according to FERC, the evidence "suggests that RPM has in fact succeeded in securing sufficient capacity to meet reliability requirements for the PJM region." PJM Interconnection, LLC, 137 FERC ¶ 61,145, at ¶ 3 (2011).

Maryland's initiative disrupts this scheme by substituting the state's preferred incentive structure for that approved by FERC. See PPL EnergyPlus, LLC v. Hanna, No. 11-745, 2013 WL 5603896, at *36 (D.N.J. Oct. 11, 2013) (describing the distorting impact of a similar New Jersey program on the business decisions of private participants in the PJM auction). Two features of the Order render its likely effect on federal markets particularly problematic. First, as noted, the CfDs are structured to actually set the price received at wholesale. They therefore directly conflict with the auction rates approved by FERC. Second, the duration of the subsidy -- twenty years -- is substantial.

The Order is preempted for the further reason that it conflicts with NEPA, which represents an exception to PJM's otherwise steadfast commitment to a uniform market clearing price. In order to stimulate plant construction, NEPA carves out a three-year period during which certain new generators are eligible to receive a fixed price for the capacity they sell in the PJM markets. See PJM Interconnection, LLC, 128 FERC ¶ 61,157, at ¶ 92 (2009). CPV petitioned FERC to extend the NEPA period to ten years on the grounds that the three-year period was insufficient to achieve its objective. Id. at ¶ 93. FERC rejected CPV's request, stating that "[b]oth new entry and retention of existing efficient capacity are necessary to ensure reliability and both should receive the same price so that the price signals are not skewed in favor of new entry." Id. at ¶ 102.

The Generation Order represents an effort by the state to directly override this explicit policy choice. As a functional matter, the CfDs extend the NEPA period for CPV to twenty years, a duration vastly exceeding the current NEPA term and double the term that CPV unsuccessfully requested FERC to institute. Maryland has sought to achieve through the backdoor of its own regulatory process what it could not achieve through the front door of FERC proceedings. Circumventing and displacing federal rules in this fashion is not permissible.

25

Appellants assert that no conflict is present because FERC explicitly accommodated -- via the MOPR -- the participation of subsidized plants in its auction. See, e.g., Intervenor-Appellant's Reply Br. at 23. The fact that FERC was forced to mitigate the Generation Order's distorting effects using the MOPR, however, tends to confirm rather than refute the existence of a conflict. Furthermore, FERC's own comments on the subject belie appellants' claim that the agency has affirmatively approved the Generation Order. See PJM Interconnection, LLC, 137 FERC at ¶ 3 ("Our intent is not to pass judgment on state and local policies and objectives with regard to the development of new capacity resources . . . .").

As was the case with our field preemption holding, our conflict preemption ruling is narrow and focused upon the program before us. Obviously, not every state regulation that incidentally affects federal markets is preempted. Such an outcome "would thoroughly undermine precisely the division of the regulatory field that Congress went to so much trouble to establish . . . , and would render Congress' specific grant of power to the States to regulate production virtually meaningless." Nw. Cent. Pipeline Corp., 489 U.S. at 515. The Generation Order, however, is simply a bridge too far. It

presents a direct and transparent impediment to the functioning of the PJM markets, and is therefore preempted.[3]

III.

For the foregoing reasons, we hold the Generation Order preempted under federal law and affirm the judgment of the district court.

AFFIRMED

---

[3] Our conclusion that the Generation Order is preempted renders it unnecessary for us to reach plaintiffs' dormant Commerce Clause arguments, which were rejected by the district court. See Schneidewind, 485 U.S. at 311 ("Because we have concluded that Act 144 is pre-empted by the NGA, we need not decide whether, absent federal occupation of the field, Act 144 violates the Commerce Clause.").