**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 13-4330

PPL ENERGYPLUS, LLC; PPL BRUNNER ISLAND, LLC;
PPL HOLTWOOD, LLC; PPL MARTINS CREEK, LLC;
PPL MONTOUR, LLC; PPL SUSQUEHANNA, LLC;
LOWER MOUNT BETHEL ENERGY, LLC; PPL NEW
JERSEY SOLAR, LLC; PPL NEW JERSEY BIOGAS, LLC;
PPL RENEWABLE ENERGY, LLC; CALPINE ENERGY
SERVICES L.P.; CALPINE MID-ATLANTIC
GENERATION, LLC; CALPINE NEW JERSEY
GENERATION, LLC; CALPINE BETHLEHEM, LLC;
CALPINE MID-MERIT, LLC; CALPINE VINELAND
SOLAR, LLC; CALPINE MID-ATLANTIC MARKETING,
LLC; CALPINE NEWARK, LLC;EXELON GENERATION
COMPANY, LLC; GENON ENERGY, INC.;
NAEA OCEAN PEAKING POWER, LLC; PSEG POWER,
LLC; ATLANTIC CITY ELECTRIC COMPANY; PUBLIC
SERVICE ELECTRIC & GAS COMPANY

v.

LEE A. SOLOMON, in his official capacity as President of
the New Jersey Board of Public Utilities; JEANNE M. FOX,
in her official capacity as Commissioner of the New Jersey
Board of Public Utilities; JOSEPH L. FIORDALISO, in his
official capacity as Commission of the New Jersey Board of

Public Utilities; NICHOLAS V. ASSELTA, in his official capacity as Commissioner of the New Jersey Board of Public Utilities;


CPV POWER Development, Inc.;
Appellant

*HESS NEWARK, LLC, Intervenor in USCA
*(Pursuant to Courts order entered Novenmber 14, 2013)

_____

No. 13-4501
_____


PPL ENERGYPLUS, LLC; PPL BRUNNER ISLAND, LLC; PPL HOLTWOOD, LLC; PPL MARTINS CREEK, LLC; PPL MONTOUR, LLC; PPL SUSQUEHANNA, LLC; LOWER MOUNT BETHEL ENERGY, LLC; PPL NEW JERSEY SOLAR, LLC; PPL NEW JERSEY BIOGAS, LLC; PPL RENEWABLE ENERGY, LLC; CALPINE ENERGY SERVICES L.P.; CALPINE MID-ATLANTIC GENERATION, LLC; CALPINE NEW JERSEY GENERATION, LLC; CALPINE BETHLEHEM, LLC; CALPINE MID-MERIT, LLC; CALPINE VINELAND SOLAR, LLC; CALPINE MID-ATLANTIC MARKETING, LLC; CALPINE NEWARK, LLC;EXELON GENERATION COMPANY, LLC; GENON ENERGY, INC.; NAEA OCEAN PEAKING POWER, LLC; PSEG POWER, LLC; ATLANTIC CITY ELECTRIC COMPANY; PUBLIC SERVICE ELECTRIC & GAS COMPANY


v.


2

LEE A. SOLOMON, in his official capacity as President of the New Jersey Board of Public Utilities; JEANNE M. FOX, in her official capacity as Commissioner of the New Jersey Board of Public Utilities; JOSEPH L. FIORDALISO, in his official capacity as Commission of the New Jersey Board of Public Utilities; NICHOLAS V. ASSELTA, in his official capacity as Commissioner of the New Jersey Board of Public Utilities;

CPV POWER DEVELOPMENT INC.; HESS NEWARK, LLC.

LEE A. SOLOMON,
JEANNE M. FOX,
JOSEPH FIORDALISO,
NICHOLAS ASSELTA,
Apellants

_____

On Appeal from the United States District Court for the District of New Jersey

(D.C. No. 3-11-cv-00745)

District Judge: Honorable Peter G. Sheridan
_____

Argued: March 27, 2014

3

Before: FUENTES and SHWARTZ, *Circuit Judges*, and
ROSENTHAL, *District Judge*.[*]

(Opinion Filed:  September 11, 2014)

Richard F. Engel [Argued]
Lisa J. Morelli
Jennifer S. Hsia
Office of Attorney General of New Jersey
Department of Law & Public Safety
Division of Law
Richard J. Hughes Justice Complex
25 Market Street, P.O. Box 093
Trenton, NJ 08625

Alex Moreau
Office of Attorney General of New Jersey
124 Halsey Street
P.O. Box 45029
Newark, NJ 07102
*Counsel for Appellants Lee A. Solomon, Jeanne M. Fox,
Joseph Fiordaliso, and Nicholas V. Asselta in No. 13-4501*

Larry F. Eisenstat
Clifton S. Elgarten [Argued]
Richard Lehfeldt
Jennifer N. Waters
Crowell & Moring LLP

---

[*] Honorable Lee H. Rosenthal, U.S. District Judge for the
Southern District of Texas, sitting by designation.

4

1001 Pennsylvania Avenue, N.W.
Washington, DC 20004
*Counsel for Intervenor-Appellant CPV Power Development*

Justin N. Kattan
Richard M. Zuckerman [Argued]
Dentons US
1221 Avenue of the Americas
New York, NY 10020

Brian J. Molloy
Wilentz, Goldman & Spitzer
90 Woodbridge Center Drive, 8th Floor
Woodbridge, NJ 07095
*Counsel for Intervenor Hess Newark LLC*

Paul D. Clement [Argued]
Erin E. Murphy
Candice Wong
Bancroft PLLC
1919 M Street N.W., Suite 470
Washington, DC 20036
*Counsel for Appellees*

Philip J. Passanante
Pepco Holdings, Inc./Atlantic City Electric Co.
500 North Wakefield Drive
Newark, DE 19714
*Counsel for Atlantic City Electric Co.*

David Musselman
Essential Power, LLC
150 College Road West
Princeton, NJ 08540
*Counsel for Essential Power, LLC*

Robert C. Brady
William P. Deni, Jr.
Lawrence S. Lustberg
Justin T. Quinn
Gibbons
One Gateway Center
Newark, NJ 07102
*Counsel for Calpine Energy Services*

Sarah G. Novosel
Calpine Corporation
875 15th Street N.W., Suite 700
Washington, DC 20005
*Counsel for the Calpine Companies*

Darryl M. Bradford
Verónica Gómez
Exelon Corporation
10 South Dearborn Street, 49th Floor
Chicago, IL 60603

David W. DeBruin
Matthew E. Price
Jenner & Block LLP
1099 New York Avenue N.W., Suite 900
Washington, DC 20001

*Counsel for Exelon Generation Co., LLC*

Jesse A. Dillon
PPL Services Corp.
Two North Ninth Street
Allentown, PA 18101

David L. Meyer
Morrison & Foerster
2000 Pennsylvania Avenue N.W., Suite 6000
Washington, DC 20006
*Counsel for the PPL Companies*

Tamara Linde
Vaughn L. McKoy
PSEG Services Corp.
80 Park Plaza
Newark, NJ 07102

Shannen W. Coffin
Steptoe & Johnson LLP
1330 Connecticut Avenue N.W.
Washington, DC 20036
*Counsel for PSEG Power, LLC and Public Service Electric & Gas Co.*

John P. Coyle
Duncan & Allen
1575 Eye Street, N.W., Suite 300
Washington, DC 20005

7

Pamela M. Silberstein
National Rural Electric Cooperative Association
4301 Wilson Boulevard
Arlington, VA 22203
*Counsel for Amici Appellants National Rural Electric*
*Cooperative Association and American Public Power*
*Association*

Delia D. Patterson
American Public Power Association
1875 Connecticut Avenue, N. W.
Suite 1200
Washington, DC 20009
*Counsel for Amicus Appellant American Public Power*
*Association*

Susanna Chu
Kaye Scholer
901 15th Street, N.W.
Washington, DC 20005
*Counsel for Amici Curiae Vermont Public Service Board,*
*Vermont Department of Public Service, Rhode Island Public*
*Utilities Commission, New England Conference of Public*
*Utilities Commissioners Inc., Maine Public Utilities*
*Commission, Connecticut Public Utilities Regulatory*
*Authority, Connecticut Officer of Consumer Counsel,*
*Connecticut Department of Energy and Environmental*
*Protection, California Public Utilities Commission, and*
*Attorney General of Connecticut*

Clare E. Kindall [Argued]
Office of Attorney General

10 Franklin Square
New Britain, CT 06051
*Counsel to Amicus Connecticut Public Utilities Regulatory Authority*

Jeffrey A. Lamken
Martin Totaro
MoloLamken
600 New Hampshire Avenue, N.W.,
The Watergate
Washington, DC 20037
*Counsel to Amicus Curiae NRG Energy Inc.*

Eugene Grace
American Wind Energy Association
1501 M Street
Washington, DC 20005
*Counsel to Amicus Appellant American Wind Energy Association*

Ashley C. Parrish
David G. Tewksbury
King & Spalding
1700 Pennsylvania Avenue, N.W., Suite 200
Washington, DC 20006
*Counsel to Amici Curiae Electric Power Supply Association & Edison Electric Institute*

Stefanie A. Brand
Office of Public Defender
Division of the Ratepayer Advocate
140 East Front Street

4th Floor, P.O. Box 003
Trenton, NJ 08625
*Counsel to New Jersey Division of Rate Counsel*

Karis A. Gong
John L. Shepherd, Jr.
Skadden, Arps, Slate, Meagher & Flom
1440 New York Avenue, N.W., Room 10-6
Washington, DC 20005
*Counsel to Amicus Curiae PJM Power Providers Group*

Adam D. Chandler
U.S. Department of Justice
Appellate Section
950 Pennsylvania Avenue, N.W., Room 3312
Washington, DC 20530
Robert H. Solomon [Argued]
Federal Energy Regulatory Commission
888 1st Street, N.E.
Washington, DC 20426
*Counsel to Amici Curiae Federal Energy Regulatory*
*Commission and the United States of America*

James P. Melia
Aspassia V. Staevska
Kenneth R. Stark
Pennsylvania Public Utilities Commission
400 North Street
Keystone Building
Harrisburg, PA 17120
*Counsel to Amicus Appellee Pennsylvania Public Utility*
*Commission*

## OPINION OF THE COURT

FUENTES, *Circuit Judge*.

Dissatisfied with the stock and reliability of power-generating facilities in New Jersey, the state adopted the Long Term Capacity Pilot Program Act. The Act—known as LCAPP—instructed New Jersey's Board of Public Utilities to promote the construction of new power-generating facilities in the state. Rather than pay for the construction of these plants directly, the Board of Public Utilities crafted a set of contracts, called Standard Offer Capacity Agreements, that assured new electric energy generators fifteen years of revenue from local utilities and, ultimately, New Jersey ratepayers. LCAPP guaranteed revenue to new generators by fixing the rates those generators would receive for supplying electrical capacity, that is, the ability to make energy when called upon.

The federal government, however, has exclusive control over interstate rates for wholesales of electric capacity. So when New Jersey arranged for LCAPP generators to receive preferential capacity rates, the state entered into a field of regulation beyond its authority. Accordingly, federal law preempts, and thereby invalidates, LCAPP and the related Standard Offer Capacity Agreements. We, therefore, affirm the District Court's judgment.

Although we affirm, we address our opinion to the field of interstate rates, and not to electric energy markets generally. Moreover, because we determine that LCAPP has been field preempted, we do not reach the conflict preemption and dormant Commerce Clause arguments raised by the parties.

11

## I. Background of the Case

This case concerns New Jersey's authority to arrange for the construction of new electric generators through a scheme focused on capacity prices. New Jersey's legislation, and its reasons for pursuing it, make sense only in the broader context of the regional energy market. Our analysis begins there.

### A. Regulatory framework

Electric energy generation and transmission occur in a complex regulatory environment populated with multiple private and public actors operating under the supervision of both state and federal agencies. The Federal Power Act embodies Congress's attempt "to reconcile the claims of federal and of local authorities and to apportion federal and state jurisdiction over the industry." *Conn. Light & Power Co. v. Fed. Power Comm'n*, 324 U.S. 515, 531 (1945).

> *1. Both the federal government and the states regulate aspects of the electric energy system.*

With the Federal Power Act, Congress placed "the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce" under federal control. 16 U.S.C. § 824(a). Through the Act, Congress exercised its Commerce Clause prerogative to regulate matters of interstate commerce that the states could not. *Cf. Public Util. Comm'n of R.I. v. Attleboro Steam & Elec. Co.*, 273 U.S. 83, 89-90 (1927) (holding that the regulation of wholesale energy transactions that are "fundamentally interstate from beginning to end" may come only from the "exercise of the power vested in Congress."). And Congress further extended federal authority to those

electric energy matters indirectly related to interstate commerce that had previously been subject to state regulation. *See New York v. F.E.R.C.*, 535 U.S. 1, 6 (2002).

But Congress preserved state authority over many aspects of the electric energy industry. The Federal Power Act disclaimed any attempt to regulate "any other sale of electric energy" and declared that federal regulators "shall not have jurisdiction, except as specifically provided . . . over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce." 16 U.S.C. § 824(b)(1). So while the federal government has exclusive control over interstate rates and transmission, the "[n]eed for new power facilities, their economic feasibility, and rates and services, are areas that have been characteristically governed by the States." *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 205 (1983).

> *2. FERC has exclusive authority over interstate capacity sales and transmissions, and it has exercised that authority through regional transmission organizations.*

With respect to electric energy sales and transmissions, the federal government has placed one agency in charge of implementing the Federal Power Act, the Federal Energy Regulatory Commission. This agency, known as FERC, "regulates the sale of electricity at wholesale in interstate commerce." *Entergy La., Inc. v. La. Pub. Serv. Comm'n*, 539 U.S. 39, 41 (2003). FERC's jurisdiction over interstate wholesale rates is exclusive. *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 966 (1986). Accordingly, FERC alone has the responsibility to "ensure that wholesale rates are

just and reasonable." *Entergy La., Inc.*, 539 U.S. at 41 (quotation marks omitted); 16 U.S.C. § 824d(a).

While FERC once directly considered whether the wholesale rates submitted to it were "just and reasonable," the agency has since moved away from this approach. Now FERC favors using market mechanisms to produce competitive rates for interstate sales and transmissions of energy. As part of this approach, FERC oversees regional transmission organizations that facilitate market operations.

PJM Interconnection LLC operates as the federally regulated regional transmission organization for the PJM region. PJM takes its name from "Pennsylvania," "Jersey," and "Maryland," the home states of the first utilities to pool their excess power and capacity in 1927. Today, the PJM region encompasses all or part of thirteen states and the District of Columbia, including the entirety of New Jersey. PJM operates the largest centrally dispatched power market in the world.

As a regional transmission organization, PJM has two responsibilities of significance to this case. First, PJM manages the flow of electric energy throughout the regional power grid, "dispatching" energy in real time to where it is needed. App'x 32. Second, PJM facilitates the interstate sales of electricity products, including energy and capacity, by managing marketplaces where those products may be exchanged. Electric energy is "the actual electricity that electric generators produce and which residential and business customers ultimately use." App'x 35 (quotation marks omitted). By contrast, electric capacity is "the ability to produce [energy] when called upon." App'x 36 (quotation marks omitted). In a system, such as PJM, where multiple power generators pool their power, capacity describes the

14

total amount of electricity-generating resources available for use. In other words, capacity is to energy what parking spaces are to cars—a measure of how much traffic the system can accommodate.

>    3. *New Jersey has moved away from a monopoly model for electric power generation and toward a market-based model approach.*

New Jersey once followed a traditional utility model, regulating local monopolies that both generated and distributed power to an exclusive service area. In 1999, however, New Jersey enacted the Electric Discount and Energy Competition Act, N.J. Stat. § 48:3-49 *et seq*. The Act restructured New Jersey's electric energy system so "customers would have the right to choose their electricity suppliers" and so that energy suppliers could obtain their energy from wholesale energy markets. App'x 44; *see also* N.J. Stat. § 48.3-50. To this end, New Jersey divorced the entities that generate electricity from those that supply it.

The change produced a delicate circuitry of interdependence between private entities and public utilities, and between New Jersey and federally-regulated wholesale energy markets. Generators, such as coal-fired or natural gas power plants, sell their capacity and energy to PJM through various PJM auctions. Load-serving entities pay PJM for furnishing capacity and energy, and, in turn, sell energy to consumers.[1] Electricity distribution companies, acting as

---

[1] In New Jersey, customers may choose between numerous energy suppliers. The major electricity suppliers include Atlantic City Electric, Jersey Central Power & Light, Rockland Electric, and Public Service Electric & Gas.

15

common carriers, use their network of power lines to transfer energy from generators to consumers.

Although New Jersey restructured its approach to electric energy regulation, it did not cede its "authority over the siting and construction of power plants." App'x 44. New Jersey's state utility regulator, the Board of Public Utilities, retained statutory authority for "general supervision and regulation of and jurisdiction and control over all public utilities." N.J. Stat. § 48:2-13(a). Pursuant to this authority, New Jersey has, for example, asserted jurisdiction over "[t]he charges assessed to customers for basic generation service," *id.* § 48:3-57(a)(1), and the licensing of electric power suppliers, *id.* § 48:3-78.

## B. New Jersey passed LCAPP to encourage the construction of new power plants.

Roughly a decade after New Jersey restructured its electric power industry, New Jersey's legislature foresaw crisis. The legislature found that "New Jersey is experiencing an electric power capacity deficit and high power prices." N.J. Stat. § 48:3-98.2(e). The legislature warned that, "[a]s a result of a lack of new, efficient electric generation facilities, New Jersey has become more reliant on coal-fired power plants." *Id.* § 48:3-98.2(f). And the legislature specifically found that PJM's capacity market "has not resulted in large additions of peaking facilities or any additions of intermediate or base load resources available to the region and the State." N.J. Stat. § 48:3-98.2(b). New Jersey concluded that it needed more electric energy generators.

New Jersey's legislature enacted LCAPP in January 2011 to address its concerns. *See id.* § 48:3-98.3. LCAPP aimed to encourage power generation companies to construct new power plants in New Jersey in order to add a cumulative

16

2,000 megawatts of capacity to the regional power grid from which New Jersey obtained its electrical energy. *Id.* § 48.3-98.3(c)(1).

The legislature fostered additional electric generation in New Jersey by furnishing new generators with fifteen-year contracts to supply a predetermined amount of capacity at a predetermined rate. LCAPP authorized the Board of Public Utilities to compel electricity distribution companies to sign these contracts. Broadly speaking, these contracts, known as Standard Offer Capacity Agreements, guaranteed new generators a fixed level of revenue over a fifteen-year contract term.

Pursuant to LCAPP, the Board of Public Utilities solicited bids from power generation companies willing and able to construct new electric power generation facilities. N.J. Stat. § 48:3-98.3(a)-(b). The Board received bids from thirty-four companies to participate in LCAPP, and it selected the proposals of appellant CPV Power Development, Inc., intervenor-appellant Hess Newark LLC, and amicus NRG Energy, Inc. The Board then exercised its authority to compel the New Jersey electricity distribution companies to sign Standard Offer Capacity Agreements with the LCAPP generators. Since then, Hess's and CPV's projects have moved forward; NRG's project has not.

### C. Proceedings to date

After New Jersey enacted LCAPP, several existing electrical energy generators and two electricity distribution companies filed suit against the Commissioners of the Board of Public Utilities. They sought both a declaration that the Federal Power Act preempted LCAPP and an injunction prohibiting New Jersey authorities from enforcing LCAPP.

CPV intervened to defend the law a few months later. The District Court denied both sides' motions for summary judgment. Over thirteen days, the parties tried their case to the bench. Witnesses included experts on the electric energy industry, including former regulators and corporate executives. The trial concluded with a lengthy written opinion and a judgment in favor of the plaintiffs. *See PPL EnergyPlus, LLC v. Hana*, 977 F. Supp. 2d 372 (D.N.J. 2013); App'x 92-94.

The District Court determined that the Federal Power Act preempted LCAPP. The Court concluded that LCAPP infringed on FERC's exclusive control over the price received for interstate sales of capacity. Thus, LCAPP had been field preempted. The District Court further determined that LCAPP interfered with PJM's method of determining the price of capacity. Thus, LCAPP had been conflict preempted. Finally, the District Court rejected the plaintiffs' dormant Commerce Clause attack on the grounds that they had not met their burden of proof. Based on its conclusions, the District Court declared LCAPP unconstitutional, invalidated the Standard Offer Capacity Agreements, and enjoined New Jersey from enforcing the statute.

The Board of Public Utilities and CPV appealed. Hess Newark has since intervened in CPV's appeal.[2] Each side has

----

[2] This Court granted Hess Newark's motion to intervene and consolidated the various proceedings. *See* Order dated Nov. 14, 2013, Case No. 13-4330 (granting Hess Newark's motion to intervene); Order dated Dec. 13, 2013, Case No. 13-4330 (consolidating Cases No. 13-4394 and No. 13-4501 with Case No. 13-4330)

been joined on appeal by numerous amici. At the Court's invitation, the United States and FERC, acting amicus curiae, also briefed the preemption questions in support of the appellees.

## II.    Jurisdiction and Standard of Review

Because of the Constitutional claims presented in the case, the District Court properly exercised subject matter jurisdiction pursuant to 28 U.S.C. § 1331. Because the District Court entered final judgment, we exercise appellate jurisdiction pursuant to 28 U.S.C. § 1291.

"When the district court decides a constitutional claim based on a developed factual record, we exercise plenary review of the district court's legal conclusion. We defer to the factual findings supporting that conclusion unless they are clearly erroneous." *United States v. Voigt*, 89 F.3d 1050, 1064 (3d Cir. 1996) (citation omitted).

## III.   Discussion

Congress has distinguished between those matters that belong exclusively to the federal government, such as regulation of interstate sales and transmissions of energy, and those matters that remain within the regulatory authority of the states, such as the regulation of energy generators. *See* 16 U.S.C. § 824(b).

In the American system of federalism, federal law commands primacy over state law. The "Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. As between state

and federal law, therefore, any state law that "interferes with or is contrary to federal law . . . must yield." *Free v. Bland*, 369 U.S. 663, 666 (1962) (citing *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 210 (1824)).

Accordingly, if LCAPP intrudes into the exclusively federal field or conflicts with valid federal regulation, federal law preempts its effect and renders it invalid. *See Farina v. Nokia Inc.*, 625 F.3d 97, 115 (3d Cir. 2010). If, on the other hand, LCAPP addresses a local matter and leaves federal law unimpaired, it remains valid. *See id.* "Pre-emption analysis requires us to compare federal and state law." *PLIVA, Inc. v. Mensing*, 131 S. Ct. 2567, 2573 (2011). We do so with "the basic assumption that Congress did not intend to displace state law." *Farina*, 625 F.3d. at 116 (alteration omitted) (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)). Only a clear and manifest conflict with federal law, or clear and manifest Congressional intent to override state choices, will overcome the presumption against preemption. *Id.* at 117.

**A. Comparing LCAPP's subject matter to the federal regulation of interstate sales and transmissions of energy**

The core of this case concerns field preemption, specifically whether LCAPP has strayed into the exclusive federal area of interstate wholesale rates. This begs the question of what the federal government and New Jersey have each regulated. Accordingly, within the broader framework described in Part I, we must fill in some of the details of PJM's FERC-approved approach to setting market prices and LCAPP's design to incentivize the construction of new

20

electric generators.[3] In practice, FERC, through PJM, regulates aspects of interstate wholesale rates through a capacity auction, while LCAPP encourages the construction of new generators by arranging for a capacity price supplement. We determine that LCAPP effectively sets capacity prices and therefore regulates the same field occupied by FERC.

> 1. *Through regional transmission organizations, FERC uses market mechanisms to price and sell electric capacity.*

Although the Federal Power Act speaks to interstate wholesales of electric energy, "the wholesale price for capacity . . . is squarely, and indeed exclusively, within FERC's jurisdiction." *N.J. Bd. of Pub. Utils. v. F.E.R.C.*, 744 F.3d 74, 97 (3d Cir. 2014). FERC has determined that "maintaining adequate resources" bears "a significant and direct effect on" wholesale rates. *PJM Interconnection, L.L.C.*, 119 FERC ¶ 61318, at 40 (2007). Therefore, FERC regulates interstate sales of electric capacity as part of its approach to regulating electric energy rates. *See Utilimax.com, Inc. v. PPL Energy Plus, LLC*, 378 F.3d 303, 305 (3d Cir. 2004).

---

[3] We recite the factual details necessary to decide the preemption question before us, resting on the careful factual findings of the District Court. In a related case, our Court described the federal and state regulatory schemes in greater detail. *See generally N.J. Bd. of Pub. Utils. v. F.E.R.C.*, 744 F.3d 74 (3d Cir. 2014).

FERC has approved PJM's Reliability Pricing Model as the means to set the interstate wholesale price for electric capacity in the PJM region. The Reliability Pricing Model attempts to match supply of capacity to demand for capacity. To calculate demand, PJM uses data from market participants and sophisticated computer models. To calculate supply, PJM uses two mechanisms. First, PJM tabulates all generation capacity within the PJM region that has been prearranged between suppliers and users of energy. This includes, for example, capacity associated with state-run monopolies or capacity privately exchanged between load-serving entities and energy generators. Second, PJM uses an auction to obtain the additional capacity needed to meet projected demand. The winners of the auction agree to provide capacity to PJM. *See generally* PJM Capacity Market Operations, PJM Manual 18: PJM Capacity Market §§ 3 ("Demand in the Reliability Pricing Model"), 4 ("Supply Resources in the Reliability Pricing Model") (21st ed. 2014).

The Reliability Pricing Model is a forward market and focuses on the capacity to be demanded and supplied for a one-year period beginning three years in the future. For example, the 2014-2015 Model settled capacity obligations for 2017-2018. And if the model has functioned properly, in three-years' time PJM will have contracted with enough capacity providers to satisfy the peak demand for capacity during 2017-2018.

Within the Reliability Pricing Model, the Base Residual Auction establishes the price capacity providers will receive for residual capacity supplied to PJM. Providers propose an amount of capacity they will offer to PJM, say 1,000 megawatt-hours per day, and the price at which they will offer that capacity, say $500 per megawatt per day. PJM

orders these bids from lowest in price to highest in price. PJM then accepts bids, starting with the lowest-price bid, until the cumulative capacity it has accepted satisfies PJM's auction goal. At that point, PJM rejects all other bids. The price of the last accepted bid becomes the price PJM will pay for all accepted auction bids. For example, if the $500 bid is the last one needed to satisfy demand, for example, $500 becomes the auction "clearing price." App'x 48.

> 2. *New Jersey, through LCAPP and the Standard Offer Capacity Agreements, has legislated what rates LCAPP generators will receive for their sales of capacity.*

By design, LCAPP focuses on capacity and capacity prices. Recall that the contracts here are standard offer *capacity* agreements contemplated by the Long Term *Capacity* Agreement Pilot Program. *See* N.J. Stat. § 48:3-51. And the Standard Offer Capacity Agreement price—referred to as the Standard Offer Capacity Price—is "the capacity price that is fixed for the term of the [agreement] and which is the price to be received by eligible generators under a board-approved [agreement]." *Id*.

New Jersey's legislature charged the Board of Public Utilities with implementing LCAPP to achieve New Jersey's stated policy goal of providing long-term price assurance to new energy generators. *See id*. § 48:3-98.3(c)(4). The Board did so by focusing on capacity and capacity prices:

- First, the Board "awarded" each generator a specific amount of capacity to transact through its Standard Offer Capacity Agreement.

- Second, the Board required generators to "participate in and clear" PJM's annual capacity auction. N.J. Stat.

23

§ 48:3-98.3(c)(12). Thus, when NRG's bid failed to clear the PJM auction, its LCAPP participation ended.

- Third, the Board guaranteed each generator a fixed price for its cleared capacity. The Board achieved this by attempting to structure the Standard Offer Capacity Agreements as contracts-for-differences between the price of capacity received by a generator from the PJM auction and a price fixed by the Agreement itself. If the Agreement price exceeded the auction price, the Agreement required the electricity distribution companies to pay the difference in price, multiplied by the amount of capacity, to the LCAPP generators. If the auction price exceeded the Agreement price, the Agreement obliged the LCAPP generators to pay the difference in price, multiplied by the amount of capacity, to the electricity distribution companies.

In practice, the Standard Offer Capacity Agreements offered financial assurance to LCAPP generators: for a fixed amount of capacity, generators would receive a fixed price. And the Agreements extended these assurances for a fifteen-year term, with the price increasing each year.

*3. Both FERC, through PJM, and New Jersey attempt to regulate electric capacity prices and sales.*

FERC, acting through PJM, uses the Base Residual Auction to fix the capacity price electric generators will receive for the capacity they sell through PJM. At the same time, New Jersey, through LCAPP, has legislated that LCAPP generators will both receive the federal price for interstate capacity sales and also receive an additional amount fixed by the BPU. Both efforts regulate electric capacity prices and sales.

We determine that LCAPP, through the Standard Offer Capacity Agreements, attempts to regulate the same subject matter that FERC has regulated through PJM's Reliability Pricing Model. The Agreements guarantee LCAPP generators a "multiyear pricing supplement" to raise the prevailing capacity price to an amount of New Jersey's liking. App'x 59. Indeed, New Jersey regulated the Standard Offer Capacity Rates precisely because the legislature believed that PJM's market-based incentives had failed to encourage new electric generators to construct adequate electric generation facilities. N.J. Stat. § 48:3-98.2(b). LCAPP builds on PJM's capacity prices.

Accordingly, New Jersey misses the mark when it argues that each Standard Offer Capacity Agreement represents "a contract for differences, functioning like a hedge" and, therefore, does not transact in capacity. *See, e.g.*, CPV Br. 39. True, LCAPP's price assurance insulates LCAPP generators from market volatility and thus eliminates their risk. But the Agreements provide more than risk-hedging; they provide for the supply and sale of capacity, as well. LCAPP commands generators to sell capacity to PJM. In return, New Jersey's statute ensures that the generators will receive the Standard Offer Capacity Rate for each quantity of capacity offered at auction and not solely the auction price they would have otherwise received. Accordingly, we agree with the District Court that "the Board essentially sets a price for wholesale energy sales" for LCAPP generators. App'x 78; *accord PPL EnergyPlus, LLC v. Nazarian*, 753 F.3d 467, 476 (4th Cir. 2014) (determining that a Maryland initiative similar to LCAPP "functionally sets the rate that [a generator] receives for its sales in the PJM auction").

Anticipating this result, LCAPP's defenders contend that if the Standard Offer Capacity Agreements set capacity prices then the law would not be preempted because the reasonableness of the Agreement's rates would be within FERC's exclusive jurisdiction to review. True, FERC has jurisdiction over certain contracts that set rates between market participants. *See NRG Power Mktg., LLC v. Me. Pub. Utils. Comm'n*, 558 U.S. 165, 171 (2010). But this argument conflates the inquiry into LCAPP's field of regulation with an inquiry into the reasonableness of the Standard Offer Capacity Rates. Here, whether the Standard Offer Capacity Agreements pick "just and reasonable" capacity prices is beside the point. What matters is that the Agreements have set capacity prices in the first place.

## B. Because New Jersey has legislated in an exclusively federal field, its law must give way.

Because FERC has exercised control over the field of interstate capacity prices, and because FERC's control is exclusive, New Jersey's efforts to regulate the same subject matter cannot stand. "Where Congress has delegated the authority to regulate a particular field to an administrative agency, the agency's regulations issued pursuant to that authority have no less preemptive effect than federal statutes, assuming those regulations are a valid exercise of the agency's delegated authority." *Fellner v. Tri–Union Seafoods, L.L.C.*, 539 F.3d 237, 243 (3d Cir. 2008). Here, FERC's use of the Base Residual Auction to set interstate capacity prices is a lawful exercise of its authority. *See N.J. Bd. of Pub. Utils.*, 744 F.3d at 97. Indeed, only FERC has the authority to set interstate capacity prices. *Id.* So the Federal Power Act, as administered by FERC, preempts and, therefore, invalidates, state intrusions into the field. *Cf. Fid. Fed. Sav. & Loan Ass'n*

*v. de la Cuesta*, 458 U.S. 141, 153 (1982). New Jersey's regulations must yield.

LCAPP's defenders respond that New Jersey's interference with capacity prices does not trigger preemption because it is a lawful exercise of the state's authority to promote new generation resources. New Jersey does have authority over local energy matters, including the construction of power plants. *See, e.g.*, *So. Cal. Edison Co. & San Diego Gas & Elec. Co.*, 71 FERC ¶ 61,269, at 3 (1995). But LCAPP incentivizes the construction of new power plants by regulating the rates new electric generators will receive for their capacity. New Jersey could have used other means to achieve its policy goals.[4] Because Congress has evinced its intent to occupy the entire field of interstate capacity rates, however, New Jersey's reasons for regulating in the federal field cannot save its effort: "any state law falling within that [federal] field is preempted." *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984).

That New Jersey has attempted to regulate federal matters for local purposes also distinguishes its situation from *Northwest Central Pipeline v. State Corp. Commission of Kansas*, 489 U.S. 493, 512-13 (1989). There, the U.S.

---

[4] For example, permissible means may include "utilization of tax exempt bonding authority, the granting of property tax relief, the ability to enter into favorable site lease agreements on public lands, the gifting of environmentally damaged properties for brownfield development, and the relaxing or acceleration of permit approvals." App'x 74. New Jersey may also directly subsidize generators so long as the subsidies do not essentially set wholesale prices.

Supreme Court rejected the argument that Kansas overstepped its authority to regulate the gathering of natural gas by promulgating rules that, if enforced, would indirectly affect interstate rates. *Id.* at 512-14. By contrast, LCAPP does not regulate the construction of new power plants, causing an incidental effect on the interstate price of capacity. Rather, LCAPP sets a price of capacity that will lead to the construction of new power plants. New Jersey cannot excuse LCAPP's interference with capacity prices as incidental to its scheme because the statute's explicit objective is to supplement capacity prices.

Nor can the statute be saved by the fact that its design incorporates, rather than repudiates, PJM's capacity auction clearing price. Recall that PJM pays generators for the capacity they supply to PJM, and it charges load-serving entities for the proportional share of the capacity they obtain though PJM. LCAPP supplements what the generators receive from PJM with an additional payment financed by payments from electric distribution companies, the public utilities that own local transmission lines. Because electricity distribution companies do not participate in PJM's capacity auction, and because PJM still pays generators the auction clearing price, LCAPP artfully steps around the capacity transactions facilitated by PJM. The arrangement does not save the law. "[I]f FERC has jurisdiction over a subject, the States cannot have jurisdiction over the same subject." *See Miss. Power & Light Co. v Miss. ex rel. Moore*, 487 U.S. 354, 377 (1988) (Scalia, J., concurring). Thus, we agree with the Fourth Circuit that "[t]he fact that [these sorts of payments] do[] not formally upset the terms of a federal transaction is no defense, since the functional results are precisely the same." *Nazarian*, 753 F.3d at 477. The generators receive a different

28

price for the capacity they clear through PJM than what FERC intended.

## IV.    The Federal Field has Limits

Counsel to various state amici describe the District Court's preemption decision as unprecedented:

> This is the first time we have a state law to address state long-term energy needs under a state procurement paid for by state rate payers, [that] is nonetheless deemed to be field preempted under the Federal Power Act as well as conflict preempted because it might have an effect on the market when anything a state does for generation will have [an] effect.

Tr. of Oral Argument at 32:02-09 (March 27, 2014). In particular, LCAPP's defenders fret that a decision in favor of preemption will hamstring state-led efforts to develop renewable and reliable electric energy resources.

However broadly we might have decided this case, our holding today focuses instead on the field of interstate rates and, in particular, on capacity prices. Because we agree with the District Court that LCAPP and the Standard Offer Capacity Agreements attempt to regulate an exclusively federal field, we do not decide whether the District Court also correctly determined that LCAPP "poses as an obstacle" to

29

PJM's markets and has been conflict preempted. *See* App'x 86. Thus, we have no occasion to conclude that PJM's markets preempt any state act that might intersect a market rule.

Nor do we endorse the argument that LCAPP has been field preempted because it affects the market clearing price by increasing the supply of electric capacity. *Cf.* FERC & United States Amicus Br. 11-17. Holding all else constant, an increase in capacity resources will cause supply to satisfy demand at a lower price. So LCAPP has the theoretical ability to influence the wholesale price of energy and capacity in PJM by enlarging the supply of capacity. If any effect on interstate markets could trigger preemption, LCAPP would be irredeemably flawed.

But the law of supply-and-demand is not the law of preemption. When a state regulates within its sphere of authority, the regulation's incidental effect on interstate commerce does not render the regulation invalid. *Nw. Cent. Pipeline Corp.*, 489 U.S. at 514. Accordingly, we do not view LCAPP's incidental effects on the interstate wholesale price of electric capacity as the basis of its preemption problem. Indeed, were we to determine otherwise, the states might be left with no authority whatsoever to regulate power plants because every conceivable regulation would have some effect on operating costs or available supply. That is not the law. The states may select the type of generation to be built—wind or solar, gas or coal—and where to build the facility. Or states may elect to build no electric generation facilities at all. *See Conn. Dep't of Pub. Util. Control v. F.E.R.C.*, 569 F.3d 477, 481 (D.C. Cir. 2009). The states' regulatory choices accumulate into the available supply transacted through the interstate market. The Federal Power Act grants FERC

exclusive control over whether interstate rates are "just and reasonable," but FERC's authority over interstate rates does not carry with it exclusive control over any and every force that influences interstate rates. Unless and until Congress determines otherwise, the states maintain a regulatory role in the nation's electric energy markets. Today's decision does not diminish that important responsibility.

## V. Conclusion

We affirm the District Court's judgment. LCAPP compels participants in a federally-regulated marketplace to transact capacity at prices other than the price fixed by the marketplace. By legislating capacity prices, New Jersey has intruded into an area reserved exclusively for the federal government. Accordingly, federal statutory and regulatory law preempts and, thereby, invalidates LCAPP and the Standard Offer Capacity Agreements.

In deciding that LCAPP has been field preempted because it sets capacity rates, we do not accept the argument that field preemption will occur whenever a state's legislation indirectly affects matters within FERC's jurisdiction. By statute and tradition, states have a role to play in energy markets.