**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4163-16T1

IN THE MATTER OF
ADOPTION OF AMENDMENTS
TO N.J.A.C. 14:8-1.2, 2.1
THROUGH 2.6, 2.9, 2.10 and
2.11.

_____

Argued September 18, 2018 – Decided July 30, 2019

Before Judges Hoffman, Suter and Geiger.

On appeal from the New Jersey Board of Public Utilities, Docket No. QO16020130.

William Harla argued the cause for appellant Community Energy Solar, LLC (DeCotiis, FitzPatrick, Cole & Giblin, LLP, attorneys; William Harla, of counsel; Christopher J. Turano, on the brief).

Yao Xiao, Deputy Attorney General, argued the cause for respondent New Jersey Board of Public Utilities (Gurbir S. Grewal, Attorney General, attorney; Jason W. Rockwell, Assistant Attorney General, of counsel; Yao Xiao, on the brief).

PER CURIAM

Community Energy Solar, LLC (CES) appeals the amendment of two regulations by the New Jersey Board of Public Utilities (the BPU). We reject CES's arguments that the regulations are invalid as ultra vires of the statute or arbitrary, capricious or unreasonable. We also deny its motion under Rule 2:5-5 to supplement the record in light of our decision regarding the regulations.

The appeal involves two BPU regulations: N.J.A.C. 14:8-2.5(b)(2) and N.J.A.C. 14:8-2.9(e)(2). They were part of a rule proposal on March 7, 2016, to amend "N.J.A.C. 14:8-1, to conform portions of the current rules to the provisions of P.L. 2012, c. 24 (Solar Act), and to P.L. 2015, c. 51." 48 N.J.R. 383(a) (Mar. 7, 2016). According to the BPU's proposal, these were to "bring the [BPU's] rules into compliance with the law." Ibid. Both of the challenged amendments involve solar energy.

In 1999 the Electric Discount and Energy Competition Act (EDECA), N.J.S.A. 48:3-49 to -98.5, changed the electric power industry in New Jersey. See In re Ownership of Renewable Energy Certificates, 389 N.J. Super. 481, 487-88 (App. Div. 2007). "New Jersey's electric energy system [was restructured] so 'customers would have the right to choose their electricity suppliers' and so that energy suppliers could obtain their energy from wholesale energy markets . . . . To this end, New Jersey divorced the entities that generate

electricity from those that supply it." PPL EnergyPlus, LLC v. Solomon, 766 F.3d 241, 248 (3d Cir. 2014). The change "produced a delicate circuitry of interdependence between private entities and public utilities, and between New Jersey and federally-regulated wholesale energy markets." Ibid.

Under the EDECA, utilities were required to "annually increase their reliance on renewable energy." In re Ownership, 389 N.J. Super. at 488; see N.J.S.A. 48:3-87(d). The BPU was "to create a 'renewable energy trading program' to help the industry satisfy the requirement for increased use of renewable electric power." Ibid. (citing N.J.S.A. 48:3-87(d)(2)).

In its regulations, the BPU adopted "renewable Energy Portfolio Standards." See N.J.A.C. 14:8-2.1(a). Under these standards, electricity suppliers could generate a predetermined percentage of electricity from renewable sources such as solar power. N.J.A.C.14:8-2.1(a); N.J.A.C. 14:8-2.3. An electricity supplier can generate renewable energy directly in order to satisfy its renewable energy requirements. It also can purchase certificates from other energy suppliers.

A-4163-16T1

There are Renewable Energy Certificates (RECs) and Solar Renewable Energy Certificates (SRECs).  See N.J.S.A. 48:3-51.  A SREC,[1] which is issued either by the BPU or its designee, represents "one megawatt hour . . . of solar energy that is generated by a facility connected to the distribution system in this State and has value based upon, and driven by, the energy market."  Ibid.  A REC[2] represents "one megawatt-hour of generation from a generating facility

---

[1]  As described,

> The concept is relatively simple; for every 1000 kilowatts . . . of electricity generated by solar, the generator receives one SREC.  These SRECs can, in turn, be sold to utilities on the open market, and their value is correlated to the alternative compliance fee the utility would incur for not meeting their [Renewable Portfolio Standard (RPS)] to source some of their energy from the sun.  SRECs thus provide owners of solar facilities a source of revenue to help offset the cost of installation.  SRECs provide New Jersey's utilities with a means to financially support the production of solar energy; if the utilities are not producing solar power themselves, they can satisfy their RPS by buying it in the form of SRECs from someone who is producing it.
>
> [Richard M. Hluchan, Here Comes The Sun, N.J. Lawyer Magazine, June 2011 at 31.]

[2]  "Once issued, a [REC] may be bought and sold in a public market or may be used by an electric utility to help satisfy its regulatory obligation to purchase

4

that produces Class I or Class II renewable energy . . . ." Ibid. It does not include a SREC or "an offshore wind renewable energy certificate." Ibid. "Class I renewable energy" is broadly defined as including "electric energy produced from solar technologies, photovoltaic technologies . . . ." Ibid.

In 2012, the EDECA was amended by the Solar Act of 2012, L. 2012, c. 24, "to further several goals of the State's 2011 Energy Master Plan." In re Implementation of L. 2012, c. 24, N.J.S.A. 48:3-87(t), 443 N.J. Super. 73, 75 (App. Div. 2015). This included "promoting the installation of solar projects on contaminated industrial and commercial sites that would otherwise remain unproductive, while 'discouraging large-scale solar projects on farmland and open space.'" Ibid. (quoting Press Release, Office of the Governor, Governor Christie Builds on Record of Growing Renewable Energy Sources with Action to Strengthen Solar Market (July 23, 2012)). It was amended again in 2015 to clarify Class II renewable energy regarding hydropower facilities. L. 2015, c. 51. [3]

---

increasing amounts of renewable energy each year." In re Ownership, 389 N.J. Super. at 484.

[3] More recently, the EDECA was amended by the Clean Energy Act, L. 2018, c. 17. In addition to closing the SREC program in June 2021,

A-4163-16T1

In proposing the amendments to the regulations, the BPU stated the proposed amendments were to "conform portions of the current rules to the provisions of . . . [the Solar Act] and to P.L. 2015, c 51."  48 N.J.R. 383(a) (Mar. 7, 2016).

Before the amendments,[4] N.J.A.C. 14:8-2.5(a) and (b) provided:

> (a) This section sets forth the types of energy that qualify as class I renewable energy for the purposes of issuance of a class I REC usable for compliance with this subchapter.  The Board has determined that energy listed at (b) below qualifies as class I renewable energy, with no prior approval required.  Energy listed at (d) and (e) below shall qualify as class I renewable energy if the conditions specified in those subsections are met.

> [t]he bill also requires the board [to] complete a study to evaluate how to modify or replace the SREC program in order to encourage the continued efficient and orderly development of solar renewable generating sources.  The study would evaluate how to develop a program that would reduce the costs of achieving the State's solar energy goals, provide an orderly transition from the current SREC program to a new program, develop targets for grid-connected and distribution systems, establish and update market-based maximum incentive payment caps, and encourage and facilitate market-based cost recovery through long-term contracts and energy market sales.
>
> [Assembly Committee Statement to A. 3723 2 (L. 2018, c. 17).]

[4]  There were prior amendments for each regulation.  We have only cited to the amendment at issue and the immediately preceding version.

(b) The following qualify as class I renewable energy for the purposes of this subchapter, with no prior approval required:

1. Solar electric generation in the form of solar RECs;

2. Electricity derived from wind energy;

. . . .

[N.J.A.C. 14:8-2.5 (R. 2012 d. 107, effective June 4, 2012).]

The BPU proposed to change the regulation as follows:

Full text of the proposal follows (additions indicated in boldface **thus**; deletions indicated in brackets [thus]):

14:8-2.5   Energy that qualifies for a class I REC

. . . .

(b) The following qualify as a [class] **Class** I renewable energy for the purposes of this subchapter, with no prior approval required:

. . . .

2. **Solar electric generation from a certified facility after the facility's qualification life has ended;**

[48 N.J.R. 383(a).]

The BPU also proposed to amend N.J.A.C. 14:8-2.9(e)(2).  Before its amendment, the regulation provided:

(e) Electric generation qualifies for issuance of RECs or SRECs only if:

1. It is solar electric generation produced by a generating facility that is interconnected with an electric distribution system, as defined at N.J.A.C. 14:4-1.2, that supplies electricity to one or more end users located in New Jersey; or

2. It is class I renewable energy, other than solar electric generation, and one or more of the following requirements is met:

    i. The generating facility reports its generation electronically to PJM-EIS no less frequently than monthly, and complies with any additional requirements established by PJM;[5]

    ii. All of the following requirements are met:

        (1) The generating facility reports its generation electronically no less frequently than

---

[5] This reference is to PJM Interconnection, LLC. It is

the privately-held, limited liability corporation that is a [Federal Energy Regulatory Commission]-approved Regional Transmission Organization, or its successor, that manages the regional, high-voltage electricity grid serving all or parts of [thirteen] states including New Jersey and the District of Columbia, [and] operates the regional competitive wholesale electric market, manages the regional transmission planning process, and establishes systems and rules to ensure that the regional and in-State energy markets operate fairly and efficiently.

[N.J.S.A. 48:3-51.]

monthly to an electric distribution company, as defined at N.J.A.C. 14:4-1.2, that is a member of PJM;

(2) The electric distribution company then provides the generator's report electronically no less frequently than monthly to PJM-EIS; and

(3) The generating facility complies with any additional requirements established by PJM-EIS; or

iii. The generating facility has the sale of the class I or class II renewable energy settled in the PJM wholesale market.

[N.J.A.C. 14:8-2.9(e) (R. 2013 d. 066, effective April 15, 2013).]

It proposed to change the regulation as follows:

Full text of the proposal follows (additions indicated in boldface **thus**; deletions indicated in brackets [thus]):

14:8-2.9   Issuance of RECs and SRECs

. . . .

(e) Electric generation qualifies for issuance of RECs or SRECs only if:

. . . .

2. It is [class] **Class** I renewable energy, [other than] **including** solar electric generation **after the end of the solar electric generation facility's qualification life**, and one or more of the following requirements is met:

9

. . . .

[N.J.A.C. 14:8-2.9(e)(2).]

Both regulations were adopted as proposed.

CES argues that the amendments are ultra vires because to qualify for a Class I REC under the regulations, it must first qualify as a SREC and then its 15-year SREC qualification life[6] must have ended. It argues this is contrary to the "statute and legislative intent which makes it clear that all solar energy selling into PJM qualifies as a Class I REC." It contends the rules "delete[d] solar facilities from Class I renewable energy, remove[d] eligibility for Class I RECs and den[ied these] facilities the economic benefits of qualifying for that status . . . ."

The BPU contends the regulations only address Class I RECs in the situation where the solar electric generation facility has reached the end of its qualification life because there was uncertainty whether these facilities could continue to qualify for Class I RECs. The BPU argues the regulations did not add new requirements for solar generators to qualify for Class I RECs or take away anything. It argues that other requirements—such as being connected to

---

[6] See N.J.A.C. 14:2-2.

A-4163-16T1

New Jersey's distribution system—pre-dated the regulatory amendments and find their source in the State's Energy Master Plan, the Solar Act and amendments of the EDECA in 2015.

CES responds that the statute does not require it to be connected to the State distribution system in order to receive Class I RECs prior to the expiration of its SREC life. It wants to construct a solar facility in the PJM grid region outside of New Jersey which delivers electric power into the PJM wholesale grid, and argues that just like a wind or geothermal technologies facility, it should qualify for a Class I REC. By only allowing solar generators to qualify for Class I RECs in one situation—after expiration of SREC life—CES argues the regulations "impermissibly excludes a project category eligible for REC status."

"Our review of administrative agency action is limited." Russo v. Bd of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011) (quoting In re Herrmann, 192 N.J. 19, 27 (2007)). "Appellate 'review of agency regulations begins with a presumption that the regulations are both "valid and reasonable."'" Caporusso v. N.J. Dep't of Health & Senior Servs., 434 N.J. Super. 88, 111 (App. Div. 2014) (quoting N.J. Ass'n of Sch. Adm'rs v. Schundler, 211 N.J. 535, 548 (2012)); see M.F. v. Dep't of Human Servs., Div. of Family Dev., 395 N.J. Super.

18, 29 (App. Div. 2007). "That judicial deference to administrative agencies stems from the recognition that agencies have the specialized expertise necessary to enact regulations dealing with technical matters and are 'particularly well equipped to read and understand the massive documents and to evaluate the factual and technical issues that . . . rulemaking would invite.'" M.F., 395 N.J. Super. at 29 (quoting N.J. State League of Municipalities v. Dep't of Cmty. Affairs, 158 N.J. 211, 222 (1999)). "Because '[t]he grant of authority to an administrative agency is to be liberally construed to enable the agency to accomplish the Legislature's goals,'" we generally defer to the agency's statutory interpretation. In re Pub. Serv. Elec. & Gas Co.'s Rate Unbundling, Stranded Costs and Restructuring Filings, 167 N.J. 377, 384 (2001).

"[O]ur Supreme Court has advised the judiciary that 'an ultra vires finding is disfavored' . . . [a]nd any party challenging a regulation must prove its invalidity." Caporusso, 434 N.J. Super. at 111-12 (quoting IMO Freshwater Wetlands Prot. Act Rules, 238 N.J. Super. 516, 525 (App. Div. 1989); League of Municipalities, 158 N.J. at 222). An agency may not "extend a statute to give it a greater effect than its language permits." GE Solid State, Inc. v. Dir., Div. of Taxation, 132 N.J. 298, 306 (1993) (citing Kingsley v. Hawthorne Fabrics Inc., 41 N.J. 521, 528 (1964)).

A-4163-16T1

An agency's decision should be upheld "unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." In re Herrmann, 192 N.J. at 27-28. "When an agency violates the express policy of its enabling act, the agency action may be deemed arbitrary and capricious." Caporusso, 434 N.J. Super. at 103 (citing PSE&G v. N.J. Dep't of Envtl. Prot., 101 N.J. 95, 103 (1985)). Our "[i]ntervention is warranted when the action is unsupported or unaccompanied by reasonable explanation." Ibid. (citing PSE&G, 101 N.J. at 103).

We agree with the BPU that the amendments to the regulations were narrowly focused to clarify that once a solar facility's qualification life ended in fifteen years that it could still receive Class I RECs without prior approval from the BPU. As such, the regulation addressed the "interstices" of the statute, filling a void that had not heretofore been addressed, and was not a "diversion" or a sea-change in the distribution of Class I RECs or SRECs, as CES alleges.

The BPU's proposal said as much. In proposing the amendment to N.J.A.C. 14:8-2.5(b)(2), the BPU stated that it "proposes to add energy from a solar electric generation facility after the expiration of its qualification life to the list of energy that qualifies as Class I renewable energy with no prior approval required." 48 N.J.R. 383(a) (Mar. 7, 2016). In the proposal regarding

N.J.A.C. 14:8-2.9(e)(2), it stated "the Board proposes to clarify that Class I renewable energy includes energy generated at a solar electric generation facility after the end of its SREC qualification life." Ibid. The BPU only addressed Class I RECs at the end of the facilities' qualification life; there was no pronouncement that it was adding new requirements that restricted facilities that were within their qualification life. CES complains that the BPU's action was arbitrary and capricious because it was not supported by a reasonable explanation. We reject that argument because the BPU did explain the narrow change it made.

The issue CES identified was beyond the amendment of these regulations. The BPU contends that the State's Master Plan and the Solar Act required a connection to the State's distribution system to obtain Class I RECs and SRECs. Under the Master Plan,

> [q]ualifying Class 1 electric generators (with the exception of solar and offshore wind) do not need to be located in New Jersey, but must deliver electricity into the PJM wholesale grid, which serves New Jersey. Qualifying solar electric generation must be located in New Jersey and connected to the distribution supply serving New Jersey.
>
> [2011 New Jersey Energy Master Plan, Section 4.9.3, page 46 (Dec. 6, 2011).]

A-4163-16T1

The Solar Act (L. 2012, c. 24) addresses proposed solar electric power generation facility projects and what it means to be "connected to the distribution system," which is a defined term that was added by that Act. N.J.S.A. 48:3-51, L. 2012, c. 24 § 1. Thus, there is support for the contention that connection is required. This also could be consistent with the Legislature's concern that New Jersey had a shortage of generators of electricity. See N.J.S.A. 48:3-98.2.

The BPU's power to regulate utilities is broad. In re Centex Homes, LLC, 411 N.J. Super. 244, 254 (App. Div. 2009). "Our courts have consistently held that the Legislature in Title 48 intended to delegate the widest range of regulatory power over public utilities to the [BPU]." Ibid. (alteration in original) (quoting Deptford v. Woodbury Terrace Sewerage Corp., 54 N.J. 418, 424 (1969)). The Court has further stated that the BPU's powers extend beyond those expressly granted by statute "to include incidental powers that the agency needs to fulfill its statutory mandate." In re Pub. Serv. Elec. & Gas Co., 167 N.J. at 384 (quoting In re Valley Rd. Sewerage Co., 154 N.J. 224, 235 (1998)).

We are mindful as well that the energy delivery system has been described as a "delicate circuitry of interdependence between private entities and public utilities, and between New Jersey and federally-regulated wholesale energy

A-4163-16T1

markets."  PPL EnergyPlus, 766 F.3d at 248.  Its complexity is evident from the description of the credits at issue.  CES has not explained the impact on the energy system for the State or the region of its interpretation.

We are satisfied that the regulatory amendments were narrowly focused on Class I RECs for the period once a solar facility's qualification life ended after fifteen years.  CES is candid that it is not concerned with the period after the qualification life ends.  We express no opinion on CES's concern about the requirement for connection to New Jersey's distribution system because it simply was not triggered by the amendment of these regulations.  The BPU has "the specialized expertise necessary to enact regulations dealing with technical matters and . . . to evaluate the factual and technical issues."  M.F., 395 N.J. Super. at 29 (quoting League of Municipalities, 158 N.J. at 222).  We defer to its interpretation of its regulations.  If it had intended the massive change that CES portends, we certainly would have seen evidence of this in the proposal or the numerous other comments that the BPU received.

Part of the problem has to do with CES's inaction during the notice and comment period.  It did not file anything with the BPU while the comment period was open from March 7, 2016 to May 6, 2016.  Rather, starting on November 2, 2016, and continuing through February 20, 2017, CES's consultant

and counsel contacted the BPU by email and letter. The amendments to the regulations were adopted by the BPU on February 22, 2017, and the adoption was effective on April 17, 2017. 49 N.J.R. 809(a). These emails and letters were not included by the BPU in the adoption.

CES filed its notice of appeal on June 1, 2017. Thereafter on June 30, 2017, it sent an Open Public Records Act (OPRA), N.J.S.A. 47:1A-1 to -13, request to the BPU asking for fifteen categories of records that included internal communications such as emails, text messages, notes about the proposed amendments, any document that reflected a response to the comments about the regulations, legal memoranda, any draft of the regulations, documents that had to do with a discussion about the regulations and all documents regarding the publication of the amendments. CES's counsel supplemented this by seeking documents that were part of the "deliberative process." The BPU provided an initial response, but asked for more time and a narrowing of the requests.

In October 2017, CES filed a motion under Rule 2:5-5 to correct, settle and supplement the record. It asked to include in the record on appeal five emails and one letter because these were not included in the BPU's Statement of Items Comprising the Record on Appeal (SICRA). These documents were the same as were sent to the BPU after the notice and comment period had closed

and before the amendments' adoption. The motion also asked that the BPU be required to include all other documents, whether or not privileged, that it considered in reaching a decision of the regulations.

On appeal, CES asks that we allow it to explore the complete record of the documents that the BPU considered in connection with the amendments or remand this for further proceedings before the BPU. The BPU opposes this because the documents received from CES, after the notice and comment period, were properly not considered and did not have to be included in the SICRA. As for the OPRA requested documents, the BPU contends this was an improper collateral attack and would require the production of documents protected by the deliberative process.

We agree that CES did not perfect its request for records under OPRA. CES did not file an order to show cause or verified complaint, nor a request with the Government Records Council. See N.J.S.A. 47:1A-6 (providing that a person who is denied access to a record requested under OPRA may challenge the denial in Superior Court). See also Asbury Park Press v. Monmouth Cty., 406 N.J. Super. 1, 7 (App. Div. 2009). Because the regulations address a narrow issue that CES effectively is not challenging, there is no basis to order the production of the requested records. In addition, a valid OPRA request "must

identify with reasonable clarity those documents that are desired, and a party cannot satisfy this requirement by simply requesting all of an agency's documents." Bent v. Twp. of Stafford Police Dep't, 381 N.J. Super. 30, 37 (App. Div. 2005).

We also deny the Rule 2:5-5 motion to supplement the record on appeal. There is no need to supplement the record where, "even if included, [the information would be] . . . unlikely to affect the result reached." Pressler & Verniero, Current N.J. Court Rules, cmt. 2 on R. 2:5-5 (2019) (citing In re Marvin Gastman, 147 N.J. Super. 101, 114 (App. Div. 1977)). The regulations addressed a narrow issue; the motion referenced documents that do not address that issue. Thus, we deny the motion to require supplementation of the record in these circumstances.

In re NJPDES Permit, 216 N.J. Super. 1 (App. Div. 1987), cited by CES, does not lead us to a different result. That case did not require the agency to review and comment on materials received after the notice and comment period when it promulgated the regulation or to include them in the SICRA.

Our decision is very narrow. The challenged amendments narrowly focused on Class I RECs for the period once a solar facility's qualification life ended in fifteen years. CES does not really challenge that issue. As such, the

amendments are neither ultra vires nor arbitrary, capricious or unreasonable. We express no opinion on whether a generator of solar energy must be connected to the State distribution system in order to qualify for Class I REC certificates.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4163-16T1