(Slip Opinion) OCTOBER TERM, 2015 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## HUGHES, CHAIRMAN, MARYLAND PUBLIC SERVICE COMMISION, ET AL. *v.* TALEN ENERGY MARKETING, LLC, FKA PPL ENERGYPLUS, LLC, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 14–614.   Argued February 24, 2016—Decided April 19, 2016*

The Federal Power Act (FPA) vests in the Federal Energy Regulatory Commission (FERC) exclusive jurisdiction over wholesale sales of electricity in the interstate market, but "leaves to the States alone, the regulation of [retail electricity sales]." *FERC* v. *Electric Power Supply Assn.,* 577 U. S. \_\_\_, \_\_\_. In Maryland and other States that have deregulated their energy markets, "load serving entities" (LSEs) purchase electricity at wholesale from independent power generators for delivery to retail consumers. Interstate wholesale transactions in deregulated markets typically occur through (1) bilateral contracting, where LSEs agree to purchase a certain amount of electricity from generators at a certain rate over a certain period of time; and (2) competitive wholesale auctions administered by Regional Transmission Organizations (RTOs) and Independent System Operators (ISOs), nonprofit entities that manage certain segments of the electricity grid.

PJM Interconnection (PJM), an RTO overseeing a multistate grid, operates a capacity auction. The capacity auction is designed to identify need for new generation and to accommodate long-term bilateral contracts for capacity. PJM predicts demand three years into the future and assigns a share of that demand to each participating LSE. Owners of capacity to produce electricity in three years' time then bid

———————

*Together with No. 14–623, *CPV Maryland, LLC* v. *Talen Energy Marketing, LLC, fka PPL EnergyPlus, LLC, et al.,* also on certiorari to the same court

that capacity into the auction for sale to PJM at rates the sellers set in their bids.  PJM accepts bids until it has purchased enough capacity to satisfy anticipated demand.  All accepted capacity sellers receive the highest accepted rate, called the "clearing price."  LSEs then must purchase, from PJM, enough electricity to satisfy their assigned share of overall projected demand.  FERC extensively regulates the structure of the capacity auction to ensure that it efficiently balances supply and demand, producing a just and reasonable clearing price.

Concerned that the PJM capacity auction was failing to encourage development of sufficient new in-state generation, Maryland enacted its own regulatory program.  Maryland selected, through a proposal process, petitioner CPV Maryland, LLC (CPV), to construct a new power plant and required LSEs to enter into a 20-year pricing contract (called a contract for differences) with CPV at a rate CPV specified in its proposal.  Under the terms of the contract, CPV sells its capacity to PJM through the auction, but—through mandated payments from or to LSEs—receives the contract price rather than the clearing price for these sales to PJM.  In a suit filed by incumbent generators (respondents here) against members of the Maryland Public Service Commission—CPV intervened as a defendant—the District Court issued a declaratory judgment holding that Maryland's program improperly sets the rate CPV receives for interstate wholesale capacity sales to PJM.  The Fourth Circuit affirmed.

*Held*: Maryland's program is preempted because it disregards the interstate wholesale rate FERC requires.  A state law is preempted where "Congress has legislated comprehensively to occupy an entire field of regulation," *Northwest Central Pipeline Corp.* v. *State Corporation Comm'n of Kan.*, 489 U. S. 493, 509, as well as "'where, under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,'" *Crosby* v. *National Foreign Trade Council*, 530 U. S. 363, 373.  Exercising its exclusive authority over interstate wholesale sales, see 16 U. S. C. §824(b)(1), FERC has approved PJM's capacity auction as the sole ratesetting mechanism for capacity sales to PJM, and has deemed the clearing price *per se* just and reasonable.  However, Maryland—through the contract for differences—guarantees CPV a rate distinct from the clearing price for its interstate capacity sales to PJM.  By adjusting an interstate wholesale rate, Maryland's program contravenes the FPA's division of authority between state and federal regulators.

That Maryland was attempting to encourage construction of new in-state generation does not save its program.  States may regulate within their assigned domain even when their laws incidentally affect areas within FERC's domain.  But they may not seek to achieve

Syllabus

ends, however legitimate, through regulatory means that intrude on FERC's authority over interstate wholesale rates, as Maryland has done here. See *Mississippi Power & Light Co.* v. *Mississippi ex rel. Moore*, 487 U. S. 354, 373; *Nantahala Power & Light Co.* v. *Thornburg*, 476 U. S. 953, 966. Maryland and CPV analogize the contract for differences to traditional bilateral contracts for capacity. Unlike traditional bilateral contracts, however, the contract for differences does not transfer ownership of capacity from one party to another outside the auction. Instead, Maryland's program operates within the auction, mandating LSEs and CPV to exchange money based on the cost of CPV's capacity sales to PJM.

Maryland's program is rejected only because it disregards an interstate wholesale rate required by FERC. Neither Maryland nor other States are foreclosed from encouraging production of new or clean generation through measures that do not condition payment of funds on capacity clearing the auction. Pp. 11–15.

753 F. 3d 467, affirmed.

GINSBURG, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, BREYER, ALITO, SOTOMAYOR, and KAGAN, JJ., joined. SOTOMAYOR, J., filed a concurring opinion. THOMAS, J., filed an opinion concurring in part and concurring in the judgment.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

——————

Nos. 14–614 and 14–623

——————

## W. KEVIN HUGHES, CHAIRMAN, MARYLAND PUBLIC SERVICE COMMISSION, ET AL., PETITIONERS

14–614              *v.*

### TALEN ENERGY MARKETING, LLC, FKA PPL ENERGYPLUS, LLC, ET AL.

### CPV MARYLAND, LLC, PETITIONER

14–623              *v.*

### TALEN ENERGY MARKETING, LLC, FKA PPL ENERGYPLUS, LLC, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[April 19, 2016]

JUSTICE GINSBURG delivered the opinion of the Court.

The Federal Power Act (FPA), 41 Stat. 1063, as amended, 16 U. S. C. §791a *et seq.*, vests in the Federal Energy Regulatory Commission (FERC) exclusive jurisdiction over wholesale sales of electricity in the interstate market. FERC's regulatory scheme includes an auction-based market mechanism to ensure wholesale rates that are just and reasonable. FERC's scheme, in Maryland's view, provided insufficient incentive for new electricity generation in the State. Maryland therefore enacted its own regulatory program. Maryland's program provides subsidies, through state-mandated contracts, to a new generator, but conditions receipt of those subsidies on the new

generator selling capacity into a FERC-regulated whole-sale auction.  In a suit initiated by competitors of Maryland's new electricity generator, the Court of Appeals for the Fourth Circuit held that Maryland's scheme impermissibly intrudes upon the wholesale electricity market, a domain Congress reserved to FERC alone.  We affirm the Fourth Circuit's judgment.

## I

## A

Under the FPA, FERC has exclusive authority to regulate "the sale of electric energy at wholesale in interstate commerce."  §824(b)(1).  A wholesale sale is defined as a "sale of electric energy to any person for resale."  §824(d).  The FPA assigns to FERC responsibility for ensuring that "[a]ll rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission . . . shall be just and reasonable."  §824d(a).  See also §824e(a) (if a rate or charge is found to be unjust or unreasonable, "the Commission shall determine the just and reasonable rate").  "But the law places beyond FERC's power, and leaves to the States alone, the regulation of 'any other sale'—most notably, any retail sale—of electricity."  *FERC* v. *Electric Power Supply Assn.,* 577 U. S. ___, ___ (2016) (*EPSA*) (slip op., at 1) (quoting §824(b)).  The States' reserved authority includes control over in-state "facilities used for the generation of electric energy."  §824(b)(1); see *Pacific Gas & Elec. Co.* v. *State Energy Resources Conservation and Development Comm'n*, 461 U. S. 190, 205 (1983) ("Need for new power facilities, their economic feasibility, and rates and services, are areas that have been characteristically governed by the States.").

"Since the FPA's passage, electricity has increasingly become a competitive interstate business, and FERC's role

has evolved accordingly." *EPSA*, 577 U. S., at \_\_\_ (slip op., at 4). Until relatively recently, most state energy markets were vertically integrated monopolies—*i.e.*, one entity, often a state utility, controlled electricity generation, transmission, and sale to retail consumers. Over the past few decades, many States, including Maryland, have deregulated their energy markets. In deregulated markets, the organizations that deliver electricity to retail consumers—often called "load serving entities" (LSEs)— purchase that electricity at wholesale from independent power generators. To ensure reliable transmission of electricity from independent generators to LSEs, FERC has charged nonprofit entities, called Regional Transmission Organizations (RTOs) and Independent System Operators (ISOs), with managing certain segments of the electricity grid.

Interstate wholesale transactions in deregulated markets typically occur through two mechanisms. The first is bilateral contracting: LSEs sign agreements with generators to purchase a certain amount of electricity at a certain rate over a certain period of time. After the parties have agreed to contract terms, FERC may review the rate for reasonableness. See *Morgan Stanley Capital Group Inc.* v. *Public Util. Dist. No. 1 of Snohomish Cty.*, 554 U. S. 527, 546–548 (2008) (Because rates set through good-faith arm's-length negotiation are presumed reasonable, "FERC may abrogate a valid contract only if it harms the public interest."). Second, RTOs and ISOs administer a number of competitive wholesale auctions: for example, a "same-day auction" for immediate delivery of electricity to LSEs facing a sudden spike in demand; a "next-day auction" to satisfy LSEs' anticipated near-term demand; and a "capacity auction" to ensure the availability of an adequate supply of power at some point far in the future.

These cases involve the capacity auction administered by PJM Interconnection (PJM), an RTO that oversees the

electricity grid in all or parts of 13 mid-Atlantic and Mid-western States and the District of Columbia. The PJM capacity auction functions as follows. PJM predicts electricity demand three years ahead of time, and assigns a share of that demand to each participating LSE. Owners of capacity to produce electricity in three years' time bid to sell that capacity to PJM at proposed rates. PJM accepts bids, beginning with the lowest proposed rate, until it has purchased enough capacity to satisfy projected demand. No matter what rate they listed in their original bids, all accepted capacity sellers receive the highest accepted rate, which is called the "clearing price."[1] LSEs then must purchase from PJM, at the clearing price, enough electricity to satisfy their PJM-assigned share of overall projected demand. The capacity auction serves to identify need for new generation: A high clearing price in the capacity auction encourages new generators to enter the market, increasing supply and thereby lowering the clearing price in same-day and next-day auctions three years' hence; a low clearing price discourages new entry and encourages retirement of existing high-cost generators.[2]

The auction is designed to accommodate long-term bilateral contracts for capacity. If an LSE has acquired a

———————

[1] For example, if four power plants bid to sell capacity at, respectively, $10/unit, $20/unit, $30/unit, and $40/unit, and the first three plants provide enough capacity to satisfy projected demand, PJM will purchase capacity only from those three plants, each of which will receive $30/unit, the clearing price.

[2] Because PJM operates the electricity grid in a very large region of the country, PJM divides its overall grid into geographic subregions and makes adjustments to the clearing price to reflect operating conditions in those subregions. For instance, PJM may pay a higher rate in or near areas where transmission-line congestion limits the amount of electricity that can be imported from other areas. The elevated clearing price might encourage a company to site a new power plant in a subregion where the need for local generation is great rather than elsewhere in PJM's grid.

certain amount of capacity through a long-term bilateral contract with a generator, the LSE—not the generator—is considered the owner of that capacity for purposes of the auction. The LSE sells that capacity into the auction, where it counts toward the LSE's assigned share of PJM-projected demand, thereby reducing the net costs of the LSE's required capacity purchases from PJM.[3] LSEs generally bid their capacity into the auction at a price of $0, thus guaranteeing that the capacity will clear at any price. Such bidders are called "price takers." Because the fixed costs of building generating facilities often vastly exceed the variable costs of producing electricity, many generators also function as price takers.

FERC extensively regulates the structure of the PJM capacity auction to ensure that it efficiently balances supply and demand, producing a just and reasonable clearing price. See *EPSA*, 577 U. S., at \_\_\_ (slip op., at 5) (the clearing price is "the price an efficient market would produce"). Two FERC rules are particularly relevant to

—————

[3]To take a simplified example, assume an LSE has signed a long-term bilateral contract with a generator to purchase 50 units of electricity annually at a price of $40/unit (total annual cost: $2,000). In a given year when the auction clearing price is $50/unit, assume PJM requires the LSE to purchase 100 units of electricity to satisfy its share of projected demand. The LSE bids the 50 units of capacity it already owns into the PJM auction, and PJM pays the LSE $2,500 for those 50 units. Although the LSE then must pay PJM $5,000 for the 100 units it must purchase to satisfy projected demand, the net cost to the LSE of auction participation is only $2,500. Note that the effective price the LSE pays for 50 of the 100 units it must purchase from PJM—the amount purchased through the long-term contract—is the contract price, not the clearing price. That is, the LSE pays the utility $2,000 for 50 units of capacity, receives $2,500 from PJM after selling that capacity into the auction, and then pays $2,500 to PJM to purchase 50 units of capacity, resulting in a net cost of $2,000—the contract price— for those 50 units. The LSE, of course, must pay the full clearing price—$50/unit—for the other 50 units it is obliged to purchase to satisfy its full share of projected demand.

these cases. First, the Minimum Offer Price Rule (MOPR) requires new generators to bid capacity into the auction at or above a price specified by PJM, unless those generators can prove that their actual costs fall below the MOPR price. Once a new generator clears the auction at the MOPR price, PJM deems that generator an efficient entrant and exempts it from the MOPR going forward, allowing it to bid its capacity into the auction at any price it elects, including $0. Second, the New Entry Price Adjustment (NEPA) guarantees new generators, under certain circumstances, a stable capacity price for their first three years in the market. The NEPA's guarantee eliminates, for three years, the risk that the new generator's entry into the auction might so decrease the clearing price as to prevent that generator from recovering its costs.

## B

Around 2009, Maryland electricity regulators became concerned that the PJM capacity auction was failing to encourage development of sufficient new in-state generation. Because Maryland sits in a particularly congested part of the PJM grid, importing electricity from other parts of the grid into the State is often difficult. To address this perceived supply shortfall, Maryland regulators proposed that FERC extend the duration of the NEPA from three years to ten. FERC rejected the proposal. *PJM*, 126 FERC ¶62,563 (2009). "[G]iving new suppliers longer payments and assurances unavailable to existing suppliers," FERC reasoned, would improperly favor new generation over existing generation, throwing the auction's market-based price-setting mechanism out of balance. *Ibid.* See also *PJM*, 128 FERC ¶61,789 (2009) (order on petition for rehearing) ("Both new entry and retention of existing efficient capacity are necessary to ensure reliability and both should receive the same price so that the price signals are not skewed in favor of new

entry.").

Shortly after FERC rejected Maryland's NEPA proposal, the Maryland Public Service Commission promulgated the Generation Order at issue here. Under the order, Maryland solicited proposals from various companies for construction of a new gas-fired power plant at a particular location, and accepted the proposal of petitioner CPV Maryland, LLC (CPV). Maryland then required LSEs to enter into a 20-year pricing contract (the parties refer to this contract as a "contract for differences") with CPV at a rate CPV specified in its accepted proposal.[4] Unlike a traditional bilateral contract for capacity, the contract for differences does not transfer ownership of capacity from CPV to the LSEs. Instead, CPV sells its capacity on the PJM market, but Maryland's program guarantees CPV the contract price rather than the auction clearing price.

If CPV's capacity clears the PJM capacity auction and the clearing price falls below the price guaranteed in the contract for differences, Maryland LSEs pay CPV the difference between the contract price and the clearing price. The LSEs then pass the costs of these required payments along to Maryland consumers in the form of higher retail prices. If CPV's capacity clears the auction and the clearing price exceeds the price guaranteed in the contract for differences, CPV pays the LSEs the difference between the contract price and the clearing price, and the LSEs then pass the savings along to consumers in the form of lower retail prices. Because CPV sells its capacity exclusively in the PJM auction market, CPV receives no payment from Maryland LSEs or PJM if its capacity fails to clear the auction. But CPV is guaranteed a certain rate if its capacity does clear, so the contract's terms encourage

---

[4] New Jersey implemented a similar program around the same time. The duration of the price guarantee for the New Jersey program is 15 years rather than Maryland's 20.

CPV to bid its capacity into the auction at the lowest possible price.[5]

Prior to enactment of the Maryland program, PJM had exempted new state-supported generation from the MOPR, allowing such generation to bid capacity into the

_____

[5]Two simplified examples illustrate how Maryland's program interacts with the PJM capacity auction. First, consider a hypothetical situation where the clearing price falls below the price guaranteed in the contract for differences. Assume that CPV's plant produces 10,000 units of electricity a year, and that the 20-year price guaranteed under the contract is $30/unit. Assume further that, in a given year during the duration of the price guarantee, the clearing price is $20/unit, and CPV's capacity clears the auction. CPV receives payments from Maryland LSEs of $10/unit, or $100,000, and payments from PJM of $20/unit, or $200,000. The rate CPV receives from the capacity auction is therefore $30/unit—the contract price—not $20/unit—the clearing price. Under PJM auction rules, Maryland LSEs then must purchase from PJM, at the clearing price of $20/unit, enough capacity to satisfy their assigned shares of anticipated demand. Assume that PJM requires Maryland LSEs to purchase 40,000 units of capacity. Total capacity-auction expenses for Maryland LSEs would therefore include both the payment to CPV ($100,000) and the full cost of purchasing capacity from PJM ($800,000), or $900,000. Absent Maryland's program, the LSEs' capacity-auction expenses would have included only the total cost of capacity purchases from PJM, or $800,000.

Now assume instead that the clearing price in a given year is $40/unit, which exceeds the $30/unit contract price, and that CPV's capacity clears the auction. CPV receives payments from PJM of $40/unit, or $400,000. CPV then must pay Maryland LSEs the difference between the contract price and the clearing price—in this case, $10/unit, or $100,000. The rate CPV receives from the capacity auction is therefore the contract price—$30/unit—the same price CPV received in the above example. Maryland LSEs then must purchase from PJM, at the clearing price of $40/unit, enough capacity to satisfy their share of anticipated demand. Assume that PJM again requires Maryland LSEs to purchase 40,000 units of capacity. Total capacity-auction expenses for Maryland LSEs would therefore include the full cost of capacity purchases from PJM ($1,600,000), minus the payment from CPV ($100,000), or $1,500,000. Absent Maryland's program, the LSEs would have had to pay $1,600,000 to PJM without receiving any offsetting payments from CPV.

auction at $0 without first clearing at the MOPR price. Responding to a complaint filed by incumbent generators in the Maryland region who objected to Maryland's program (and the similar New Jersey program), FERC eliminated this exemption. *PJM*, 135 FERC ¶61,106 (2011). See also 137 FERC ¶61,145 (2011) (order on petition for rehearing) ("Our intent is not to pass judgment on state and local policies and objectives with regard to the development of new capacity resources, or unreasonably interfere with those objectives. We are forced to act, however, when subsidized entry supported by one state's or locality's policies has the effect of disrupting the competitive price signals that PJM's [capacity auction] is designed to produce, and that PJM as a whole, including other states, rely on to attract sufficient capacity."); *New Jersey Bd. of Pub. Util.* v. *FERC*, 744 F. 3d 74, 79–80 (CA3 2014) (upholding FERC's elimination of the state-supported generation exemption). In the first year CPV bid capacity from its new plant into the PJM capacity auction, that capacity cleared the auction at the MOPR rate, so CPV was thereafter eligible to function as a price taker.

In addition to seeking the elimination of the state-supported generation exemption, incumbent generators—respondents here—brought suit in the District of Maryland against members of the Maryland Public Service Commission in their official capacities. The incumbent generators sought a declaratory judgment that Maryland's program violates the Supremacy Clause by setting a wholesale rate for electricity and by interfering with FERC's capacity-auction policies.[6] CPV intervened as a

_____

[6] Because neither CPV nor Maryland has challenged whether plaintiffs may seek declaratory relief under the Supremacy Clause, the Court assumes without deciding that they may. See Brief for Public Utility Law Project of New York, Inc., as *Amicus Curiae* 21 (arguing that the incumbent generators should have been required to exhaust administrative remedies before filing suit).

defendant. After a six-day bench trial, the District Court issued a declaratory judgment holding that Maryland's program improperly sets the rate CPV receives for interstate wholesale capacity sales to PJM. *PPL Energyplus, LLC* v. *Nazarian*, 974 F. Supp. 2d 790, 840 (Md. 2013). "While Maryland may retain traditional state authority to regulate the development, location, and type of power plants within its borders," the District Court explained, "the scope of Maryland's power is necessarily limited by FERC's exclusive authority to set wholesale energy and capacity prices." *Id.,* at 829.[7]

The Fourth Circuit affirmed. Relying on this Court's decision in *Mississippi Power & Light Co.* v. *Mississippi ex rel. Moore*, 487 U. S. 354, 370 (1988), the Fourth Circuit observed that state laws are preempted when they "den[y] full effect to the rates set by FERC, even though [they do] not seek to tamper with the actual terms of an interstate transaction." *PPL EnergyPlus, LLC* v. *Nazarian*, 753 F. 3d 467, 476 (2014). Maryland's program, the Fourth Circuit reasoned, "functionally sets the rate that CPV receives for its sales in the PJM auction," "a FERC-approved market mechanism." *Id.,* at 476–477. "[B]y adopting terms and prices set by Maryland, not those sanctioned by FERC," the Fourth Circuit concluded, Maryland's program "strikes at the heart of the agency's statutory power." *Id.,* at 478.[8] The Fourth Circuit cautioned that it "need not express an opinion on other state efforts to encourage new generation, such as direct subsidies or

—————————

[7] Respondents also raised arguments under the Dormant Commerce Clause and 42 U. S. C. §1983. The District Court rejected those arguments, *PPL Energyplus, LLC* v. *Nazarian*, 974 F. Supp. 2d 790, 841–855 (Md. 2013), the Fourth Circuit did not address them, and they are irrelevant at this stage.

[8] For the same reason, the Third Circuit found New Jersey's similar program preempted. *PPL Energyplus, LLC* v. *Solomon*, 766 F. 3d 241, 246 (2014).

tax rebates, that may or may not differ in important ways from the Maryland initiative." *Ibid.*

The Fourth Circuit then held that Maryland's program impermissibly conflicts with FERC policies. Maryland's program, the Fourth Circuit determined, "has the potential to seriously distort the PJM auction's price signals," undermining the incentive structure FERC has approved for construction of new generation. *Ibid.* Moreover, the Fourth Circuit explained, Maryland's program "conflicts with NEPA" by providing a 20-year price guarantee to a new entrant—even though FERC refused Maryland's request to extend the duration of the NEPA past three years. *Id.,* at 479.

We granted certiorari, 577 U. S. ___ (2015), and now affirm.

## II

The Supremacy Clause makes the laws of the United States "the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U. S. Const., Art. VI, cl. 2. Put simply, federal law preempts contrary state law. "Our inquiry into the scope of a [federal] statute's pre-emptive effect is guided by the rule that the purpose of Congress is the ultimate touchstone in every pre-emption case." *Altria Group, Inc.* v. *Good*, 555 U. S. 70, 76 (2008) (internal quotation marks omitted). A state law is preempted where "Congress has legislated comprehensively to occupy an entire field of regulation, leaving no room for the States to supplement federal law," *Northwest Central Pipeline Corp.* v. *State Corporation Comm'n of Kan.*, 489 U. S. 493, 509 (1989), as well as "where, under the circumstances of a particular case, the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Crosby* v. *National Foreign Trade Council*, 530 U. S. 363, 373 (2000) (brackets

and internal quotation marks omitted).

We agree with the Fourth Circuit's judgment that Maryland's program sets an interstate wholesale rate, contravening the FPA's division of authority between state and federal regulators. As earlier recounted, see *supra,* at 2, the FPA allocates to FERC exclusive jurisdiction over "rates and charges . . . received . . . for or in connection with" interstate wholesale sales. §824d(a). Exercising this authority, FERC has approved the PJM capacity auction as the sole ratesetting mechanism for sales of capacity to PJM, and has deemed the clearing price *per se* just and reasonable. Doubting FERC's judgment, Maryland—through the contract for differences—requires CPV to participate in the PJM capacity auction, but guarantees CPV a rate distinct from the clearing price for its interstate sales of capacity to PJM. By adjusting an interstate wholesale rate, Maryland's program invades FERC's regulatory turf. See *EPSA*, 577 U. S., at ___ (slip op., at 26) ("The FPA leaves no room either for direct state regulation of the prices of interstate wholesales or for regulation that would indirectly achieve the same result." (internal quotation marks omitted)).[9]

That Maryland was attempting to encourage construction of new in-state generation does not save its program. States, of course, may regulate within the domain Congress assigned to them even when their laws incidentally

—————

[9] According to Maryland and CPV, the payments guaranteed under Maryland's program are consideration for CPV's compliance with various state-imposed conditions, *i.e.,* the requirements that CPV build a certain type of generator, at a particular location, that would produce a certain amount of electricity over a particular period of time. The payments, Maryland and CPV continue, are therefore separate from the rate CPV receives for its wholesale sales of capacity to PJM. But because the payments are conditioned on CPV's capacity clearing the auction—and, accordingly, on CPV selling that capacity to PJM—the payments are certainly "received . . . in connection with" interstate wholesale sales to PJM. 16 U. S. C. §824d(a).

affect areas within FERC's domain. See *Oneok, Inc.* v. *Learjet, Inc.*, 575 U. S. ___, ___ (2015) (slip op., at 11) (whether the Natural Gas Act (NGA) preempts a particular state law turns on "the *target* at which the state law *aims*").[10] But States may not seek to achieve ends, however legitimate, through regulatory means that intrude on FERC's authority over interstate wholesale rates, as Maryland has done here. See *ibid.* (distinguishing between "measures *aimed directly* at interstate purchasers and wholesalers for resale, and those aimed at subjects left to the States to regulate" (internal quotation marks omitted)).[11]

The problem we have identified with Maryland's program mirrors the problems we identified in *Mississippi Power & Light* and *Nantahala Power & Light Co.* v. *Thornburg*, 476 U. S. 953 (1986). In each of those cases, a State determined that FERC had failed to ensure the reasonableness of a wholesale rate, and the State therefore prevented a utility from recovering—through retail rates—the full cost of wholesale purchases. See *Mississippi Power & Light*, 487 U. S., at 360–364; *Nantahala*,

––––––––––

[10] Although *Oneok, Inc.* v. *Learjet, Inc.*, 575 U. S. ___ (2015), involved the NGA rather than the FPA, the relevant provisions of the two statutes are analogous. This Court has routinely relied on NGA cases in determining the scope of the FPA, and vice versa. See, *e.g., id.,* at 14–15 (discussing FPA cases while determining the preemptive scope of the NGA).

[11] Maryland's program, Maryland and CPV assert, is consistent with federal law because FERC has accommodated the program by eliminating the MOPR's state-supported generation exception. Even assuming that this change has prevented Maryland's program from distorting the auction's price signals, however—a point the parties dispute— Maryland cannot regulate in a domain Congress assigned to FERC and then require FERC to accommodate Maryland's intrusion. See *Northwest Central Pipeline Corp.* v. *State Corporation Comm'n of Kan.*, 489 U. S. 493, 518 (1989) ("The NGA does not require FERC to regulate around a state rule the only purpose of which is to influence purchasing decisions of interstate pipelines, however that rule is labeled.").

476 U. S., at 956–962. This Court invalidated the States' attempts to second-guess the reasonableness of interstate wholesale rates. "'Once FERC sets such a rate,'" we observed in *Mississippi Power & Light*, "'a State may not conclude in setting retail rates that the FERC-approved wholesale rates are unreasonable. A State must rather give effect to Congress' desire to give FERC plenary authority over interstate wholesale rates, and to ensure that the States do not interfere with this authority.'" 487 U. S., at 373 (quoting *Nantahala*, 476 U. S., at 966). True, Maryland's program does not prevent a utility from recovering through retail sales a cost FERC mandated it incur—Maryland instead guarantees CPV a certain rate for capacity sales to PJM regardless of the clearing price. But *Mississippi Power & Light* and *Nantahala* make clear that States interfere with FERC's authority by disregarding interstate wholesale rates FERC has deemed just and reasonable, even when States exercise their traditional authority over retail rates or, as here, in-state generation.

The contract for differences, Maryland and CPV respond, is indistinguishable from traditional bilateral contracts for capacity, which FERC has long accommodated in the auction. See *supra,* at 4–5, and n. 3. But the contract at issue here differs from traditional bilateral contracts in this significant respect: The contract for differences does not transfer ownership of capacity from one party to another outside the auction. Instead, the contract for differences operates within the auction; it mandates that LSEs and CPV exchange money based on the cost of CPV's capacity sales to PJM. Notably, because the contract for differences does not contemplate the sale of capacity outside the auction, Maryland and CPV took the position, until the Fourth Circuit issued its decision, that the rate in the contract for differences is not subject to FERC's reasonableness review. See §824(b)(1) (FERC has jurisdiction over contracts for "*the sale of electric energy* at

wholesale in interstate commerce." (emphasis added)).[12]

Our holding is limited: We reject Maryland's program only because it disregards an interstate wholesale rate required by FERC. We therefore need not and do not address the permissibility of various other measures States might employ to encourage development of new or clean generation, including tax incentives, land grants, direct subsidies, construction of state-owned generation facilities, or re-regulation of the energy sector. Nothing in this opinion should be read to foreclose Maryland and other States from encouraging production of new or clean generation through measures "untethered to a generator's wholesale market participation." Brief for Respondents 40. So long as a State does not condition payment of funds on capacity clearing the auction, the State's program would not suffer from the fatal defect that renders Maryland's program unacceptable.[13]

\*  \*  \*

For the reasons stated, the judgment of the Court of Appeals for the Fourth Circuit is

*Affirmed.*

---

[12] Our opinion does not call into question whether generators and LSEs may enter into long-term financial hedging contracts based on the auction clearing price. Such contracts, also frequently termed contracts for differences, do not involve state action to the same degree as Maryland's program, which compels private actors (LSEs) to enter into contracts for differences—like it or not—with a generator that must sell its capacity to PJM through the auction.

[13] Because the reasons we have set out suffice to invalidate Maryland's program, we do not resolve whether, as the incumbent generators also assert, Maryland's program is preempted because it counteracts FERC's refusal to extend the NEPA's duration, or because it interferes with the capacity auction's price signals.

# SUPREME COURT OF THE UNITED STATES

————

Nos. 14–614 and 14–623

————

W. KEVIN HUGHES, CHAIRMAN, MARYLAND PUBLIC
SERVICE COMMISSION, ET AL., PETITIONERS
14–614                         *v.*
TALEN ENERGY MARKETING, LLC, FKA PPL
ENERGYPLUS, LLC, ET AL.


CPV MARYLAND, LLC, PETITIONER
14–623                         *v.*
TALEN ENERGY MARKETING, LLC, FKA PPL
ENERGYPLUS, LLC, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[April 19, 2016]

JUSTICE SOTOMAYOR, concurring.

I write separately to clarify my understanding of the pre-emption principles that should guide this Court's analysis of the Federal Power Act and that underpin its conclusion in these cases.

The process through which consumers obtain energy stretches across state and federal regulatory domains. The Federal Power Act authorizes the States to regulate energy production. 16 U. S. C. §824(b). It then instructs the Federal Government to step in and regulate wholesale purchases and energy transportation. §824(a). Finally, it allows the States to assume control over the ultimate sale of energy to consumers. §824(b). In short, the Federal Power Act, like all collaborative federalism statutes, envisions a federal-state relationship marked by interdependence.

Pre-emption inquiries related to such collaborative programs are particularly delicate. This Court has said that where "coordinate state and federal efforts exist within a complementary administrative framework, and in the pursuit of common purposes, the case for federal pre-emption becomes a less persuasive one." *New York State Dept. of Social Servs.* v. *Dublino*, 413 U. S. 405, 421 (1973). That is not to say that pre-emption has no role in such programs, but courts must be careful not to confuse the "congressionally designed interplay between state and federal regulation," *Northwest Central Pipeline Corp.* v. *State Corporation, Comm'n of Kan.*, 489 U. S. 493, 518 (1989), for impermissible tension that requires pre-emption under the Supremacy Clause.

In this context, therefore, our general exhortation not to rely on a talismanic pre-emption vocabulary applies with special force. See *Hines* v. *Davidowitz*, 312 U. S. 52, 67 (1941) ("This Court . . . has made use of the following expressions: conflicting; contrary to; occupying the field; repugnance; difference; irreconcilability; inconsistency; violation; curtailment; and interference. But none of these expressions provides an infallible constitutional test or an exclusive constitutional yardstick" (footnote omitted)).

I understand today's opinion to reflect these principles. Using the purpose of the Federal Power Act as the "ultimate touchstone" of its pre-emption inquiry, *Altria Group, Inc.* v. *Good*, 555 U. S. 70, 76 (2008), rather than resting on generic pre-emption frameworks unrelated to the Federal Power Act, the Court holds that Maryland has impermissibly impeded the performance of one of FERC's core regulatory duties. Ensuring "just and reasonable" wholesale rates is a central purpose of the Act. See 16 §824d(a). Pursuant to its mandate to set such rates, FERC has approved the PJM Interconnection capacity auction as the proper mechanism to determine the "just and reasonable" rate for the sale of petitioner CPV Mary-

land, LLC's energy at wholesale. *Ante*, at 12. Maryland, however, has acted to guarantee CPV a rate different from FERC's "just and reasonable" rate and has thus contravened the goals of the Federal Power Act. *Ibid.* Such actions must be preempted. *Mississippi Power & Light Co.* v. *Mississippi ex rel. Moore*, 487 U. S. 354, 374 (1988) ("States may not regulate in areas where FERC has properly exercised its jurisdiction to determine just and reasonable wholesale rates"). The Court, however, also rightly recognizes the importance of protecting the States' ability to contribute, within their regulatory domain, to the Federal Power Act's goal of ensuring a sustainable supply of efficient and price-effective energy. *Ante,* at 15.

Endorsing those conclusions, I join the Court's opinion in full.

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 14–614 and 14–623

_____

W. KEVIN HUGHES, CHAIRMAN, MARYLAND PUBLIC
SERVICE COMMISSION, ET AL., PETITIONERS
14–614                    *v.*
TALEN ENERGY MARKETING, LLC, FKA PPL
ENERGYPLUS, LLC, ET AL.


CPV MARYLAND, LLC, PETITIONER
14–623                    *v.*
TALEN ENERGY MARKETING, LLC, FKA PPL
ENERGYPLUS, LLC, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[April 19, 2016]

JUSTICE THOMAS, concurring in part and concurring in
the judgment.

The Court concludes that Maryland's regulatory pro-
gram invades the Federal Energy Regulatory Commis-
sion's (FERC) exclusive jurisdiction over interstate whole-
sale sales of electric energy. *Ante,* at 12. I agree that the
statutory text and framework compel that conclusion, and
that Maryland's program therefore cannot stand. Because
the statute provides a sufficient basis for resolving these
cases, I would not also rest today's holding on principles of
implied pre-emption. See, *e.g., ante,* at 11–12. For that
reason, I join the Court's opinion only to the extent that it
rests on the text and structure of the Federal Power Act
(FPA), 41 Stat. 1063, as amended, 16 U. S. C. §791a *et seq.*

The FPA divides federal and state jurisdiction over the
regulation of electricity sales. As relevant here, the FPA

grants FERC the authority to regulate "the sale of electric energy at wholesale in interstate commerce." §824(b)(1). That federal authority over interstate wholesale sales is exclusive. See, *e.g.*, *Nantahala Power & Light Co.* v. *Thornburg*, 476 U. S. 953, 966 (1986) (recognizing that Congress "vested" in FERC "exclusive jurisdiction" and "plenary authority over interstate wholesale rates"); *Mississippi Power & Light Co.* v. *Mississippi ex rel. Moore*, 487 U. S. 354, 377 (1988) (Scalia, J., concurring in judgment) ("It is common ground that if FERC has jurisdiction over a subject, the States cannot have jurisdiction over the same subject").

To resolve these cases, it is enough to conclude that Maryland's program invades FERC's exclusive jurisdiction. Maryland has partially displaced the FERC-endorsed market mechanism for determining wholesale capacity rates. Under Maryland's program, CPV Maryland, LLC, is entitled to receive, for its wholesale sales into the capacity auction, something other than what FERC has decided that generators should receive. That is a regulation of wholesale sales: By "fiddling with the effective . . . price" that CPV receives for its wholesale sales, Maryland has "regulate[d]" wholesale sales "no less than does direct ratesetting." *FERC* v. *Electric Power Supply Assn.*, 577 U. S. ___, ___ (2016) (Scalia, J., dissenting) (slip op., at 6) (emphasis deleted) (addressing analogous situation involving retail sales). Maryland's program therefore intrudes on the exclusive federal jurisdiction over wholesale electricity rates.

Although the Court applies the FPA's framework in reaching that conclusion, see *ante,* at 12, it also relies on principles of implied pre-emption, see, *e.g., ante,* at 11–12. Because we can resolve these cases based on the statute alone, I would affirm based solely on the FPA. Accordingly, I concur in the judgment and I join the Court's opinion to the extent that it holds that Maryland's program invades FERC's exclusive jurisdiction.